UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 1:23-cv-2081 |
| ) | |
| ) | |
| ALL FUNDS SEIZED FROM AND/OR FUNDS ) | |
| ON DEPOSIT FROM MORGAN STANLEY ) | |
| ACCOUNTS 658-091821-245 AND ) | |
| 658-095221-245 ) | |
| ) | |
| Defendants. ) | |

## VERIFIED COMPLAINT OF FORFEITURE IN REM

The United States of America, by counsel, Zachary A. Myers, United States Attorney for the Southern District of Indiana, and Kelly Rota, Assistant United States Attorney, files its Verified Complaint of Forfeiture in Rem, and alleges on information and belief as follows:

### NATURE OF THE CLAIM

1. This is a civil action in *rem* brought against the Defendant amounts of seized funds, namely, All Funds Seized from and/or Funds on Deposit From Morgan Stanley Accounts 658-091821-245 and 658-095221-245 (collectively, "Defendant Seized Funds" or "Defendant Property"), to forfeit those Defendant Seized Funds to United States of America (the "United States"), pursuant to the provisions of 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 (district courts have original jurisdiction of all civil action commenced by the United States) and § 1355 (district courts have original jurisdiction of any action for forfeiture).

3. This Court has *in rem* jurisdiction over the Defendant Seized Funds pursuant to 28 U.S.C. § 1355(b).

4. Venue is proper pursuant to 28 U.S.C. § 1355(b) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Indiana.

## PARTIES

5. The Plaintiff is the United States of America.

6. The Defendant Property items consist of:

    a. Any and all monies and/or funds on deposit in Morgan Stanley Accounts 658-091821-245 ("ACCOUNT 1"); and

     Any and all monies and/or funds on deposit in Morgan Stanley Accounts 658-095221-245("ACCOUNT 2").

## FACTS

**Seizure of Defendant Property**

7. On January 25, 2023, this Court issued a seizure warrant authorizing the Internal Revenue Service-Criminal Investigation to seize all funds on deposit in these two accounts.

8. On or about January 30, 2023, IRS-CI seized in place approximately $6,268,912.74 from Account 1 and approximately $3,104,790.83 from Account 2.

9. The seized funds are currently constructively seized and remain in the custody of Morgan Stanley but under the control of IRS-CI.

10. The two accounts listed above are held in the name of Maximiliano Pilipis

(hereinafter, "Pilipis"), a U.S. citizen and former resident of Noblesville, Indiana. The Defendant Property is being held in the Morgan Stanley Accounts owned by Pilipis, who opened these accounts when he resided in Indiana. Pilipis now resides in Brooksville, Florida, and the address on the two accounts is the same as Pilipis' Brooksville, Florida address.

**Pilipis's Operation of Unlicensed Money Transmitting Business**

11. On or about July 24, 2007, Pilipis caused to be registered "Aurum Capital Holdings, Inc." ("Aurum Capital Holdings") in the country of Dominica.

12. From approximately 2007 through 2013, Pilipis operated Aurum Capital Holdings as a money transmitting business by, among other things, allowing individuals to exchange virtual currencies—including Bitcoin and LR, a virtual currency issued by a company called Liberty Reserve—for other virtual currencies or for fiat currencies, such as the U.S. dollar, as a part of a commercial operation and in a manner that affected interstate commerce.

13. Beginning in or about 2010 and continuing through at least 2013, Pilipis conducted business in the name of Aurum Capital Holdings via a website Pilipis controlled and operated, AurumXchange.com.

14. Thus, from approximately 2010 through 2013, Pilipis operated AurumXchange.com as a money transmitting business, and as a part of the Aurum Capital Holdings money transmitting business, by, among other things, allowing individuals to exchange virtual currencies—including Bitcoin and LR, a virtual currency issued by a company called Liberty Reserve—for other virtual currencies or for fiat currencies, such as the U.S. dollar, as a part of a commercial operation and in manner that affected interstate commerce.

15. At all material times, Pilipis charged customers a fee or fees for exchanging virtual currencies into other virtual or fiat currencies via Aurum Capital Holdings, the

AurumXchange.com website, or both. Pilipis routinely earned those fees in the form of virtual currency, including bitcoin.

16. In or about 2013, Pilipis stopped operating Aurum Capital Holdings, Inc. and the AurumXchange.com website as a money transmitting businesses.

17. At all material times, any individual who owns or controls a money transmitting business was required to register with the Financial Crimes Enforcement Network ("FinCEN"), a bureau within the Department of Treasury, not later than the end of the 180-day period beginning on the date on which the business is established, under Title 31, United States Code, Section 5330(a) and 31 C.F.R. § 1022.380(a)(1) (formerly 31 C.F.R. §103.41(a)(1)).

18. FinCEN is charged with safeguarding the financial system from illicit use, combatting money laundering, and promoting national security.

19. FinCEN maintains a database and stores records of money transmitting business registrations submitted to the Treasury Department. The FinCEN database allows authorized users to search this database using various criteria including name, social security number, entity name, and address. Searches can also include parts of names, addresses, or entity names.

20. Between in or about 2007 and 2013, when Pilipis operated Aurum Capital Holdings as a money transmitting business, searches of the FinCEN database showed that neither Aurum Capital Holdings nor any other entity Pilipis is known to have owned or controlled, nor Pilipis himself were registered as a "money transmitting business" with FinCEN, as required by law. FinCEN further verified the same.

21. Thus, between in or about 2007 and 2013, Pilipis operated Aurum Capital Holdings as an unlicensed money transmitting business, which is a violation of Title 18, United States Code, Section 1960(b)(1)(B).

22. Between in or about 2010 and 2013, when Pilipis operated AurumXchange.com as a money transmitting business, and as a part of Aurum Capital Holdings as a money transmitting business, neither AurumXchange.com nor any other entity Pilipis owned or controlled, nor Pilipis himself, ever registered as a money transmitting business with FinCEN, as required by law.

23. Thus, between in or about 2010 and 2013, Pilipis operated AurumXchange.com as an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960(b)(1)(B).

**Property Involved in Operation of Unlicensed Money Transmitting Business is Subject to Civil Forfeiture**

24. Any property involved in the operation of an unlicensed money transmitting business, and any property traceable to such property, is subject to civil forfeiture under Title 18, United States Code, Section 981(a)(1)(A).

**The Operation of an Unlicensed Money Transmitting Business is also Specified Unlawful Activity under the Money Laundering Statutes**

25. In addition, the unlawful operation of a money service business is "specified unlawful activity," within the meaning of the federal money laundering statutes, under Title 18, United States Code, Sections 1956(c)(7) and 1961(1).

26. Accordingly, the property that Pilipis derived, directly or indirectly, through his unlawful operation of an unlicensed money transmitting business via Aurum Capital Holdings and the AurumXchange.com website constituted proceeds of specified unlawful activity ("SUA proceeds") under Title 18, United States Code, Section 1956(c)(9).

**Pilipis's Laundering of the Proceeds of his Unlawful Operation of an Unlicensed Money Transmitting Businesses**

27. After Pilipis stopped operating Aurum Capital Holdings, Inc. and AurumXchange.com as a money service business, Pilipis laundered the proceeds he derived from his unlawful operation of his Aurum Capital Holdings and AurumXchange.com website as unlicensed money transmitting businesses.

28. Specifically, in or about 2018, Pilipis began engaging in financial and monetary transactions using those SUA proceeds—which included bitcoin that consisted of or was traceable to fees charged and / or was traceable to bitcoin that was involved with conducting currency / virtual currency transactions for customers of AurumXchange.com, and that were therefore involved in, his unlawful operation of an unlicensed money transmitting business via his Aurum Capital Holdings business and AurumXchange.com website.

29. Among other financial transactions involving proceeds of Pilipis's unlawful operation of unlicensed money transmitting businesses, Pilipis transferred proceeds of that SUA conduct between bitcoin addresses.

30. For example, beginning in or about 2015, and continuing through at least 2018, Pilipis transferred proceeds of that SUA conduct, which proceeds he held as bitcoin at multiple addresses, via serial transfers, or "hops," to other addresses held anonymously in bitcoin wallets.

31. Some of those addresses through which Pilipis transferred those SUA proceeds also contained bitcoin traceable to transactions on the Silk Road darknet marketplace.

32. When Pilipis engaged in those financial transactions, he knew that the property involved in the transactions represented the proceeds of some form of unlawful activity.

33. In fact, those transactions involved SUA proceeds, namely, proceeds of Pilipis's unlawful operation of an unlicensed money transmitting business via Aurum Capital Holdings and the AurumXchange.com website.

34. When Pilipis engaged in those transactions, he knew that the transactions—conducted through multiple hops involving various bitcoin addresses—were designed in whole and in part to conceal the nature, source, location, ownership, and control of the proceeds of Pilipis's specified unlawful activity.

35. Software created by a company called Chainalysis was used to assist in tracing bitcoin that was derived from AurumXchange and the Silk Road darknet marketplace to accounts later held by Pilipis. The result of tracing the bitcoin is summarized in the diagrams and paragraphs below[1]: (The dates above the diagram represent the date that each of the movements of bitcoin took place).

---

[1] A single bitcoin wallet is capable of having many bitcoin addresses affiliated with it. Due to the way applications that manage bitcoin wallets tend to work, a new address will oftentimes be generated for every single deposit to a single wallet. Due to this structure, it can be difficult to view the open source blockchain for bitcoin and see that various addresses are actually a part of the same wallet "cluster". Chainalysis uses various techniques to determine that addresses are most likely a part of the same wallet. One of the ways Chainalysis does this is by observing instances in which a single bitcoin transaction involves multiple addresses combining their contents to send bitcoin to another address. In such a situation, Chainalysis oftentimes will determine that the multiple sending addresses are a part of the same wallet and will combine those addresses together into a single wallet cluster to simplify analyzing bitcoin transactions. Where Chainalysis software and wallet clusters are referenced in this document it is noted that at times Chainalysis has used this method and others to combine addresses into a single wallet cluster. For analytical and tracing purposes, these wallet clusters are at times described as a single wallet within this document.



36. In the diagram above the wallet cluster identified as Wallet #4 receives transfers of 100 bitcoins each from 11 different bitcoin addresses. Those bitcoins are further traceable backwards to three wallet clusters identified as wallet clusters 1, 2, and 3. The exposure of wallet clusters #1 and #2 to an account held by AurumXchange at Mt. Gox as well as to a wallet cluster for which the first bitcoin address affiliated with it begins with "1Aurum" is shown below[2]:

---

[2] The significance of this wallet being initially created with an address beginning with "1Aurum" is that at that time by rule all bitcoin addresses had to begin with a 1 but the probability of the next 5 digits being "Aurum" would have been extremely low. The technology existed at that time to manually choose certain digits in a bitcoin address rather than using a randomly created series of characters in what is referred to as a "vanity address". The use of the word

8



37.     The exposure of wallet cluster #3 to AurumXchange as well as to the Silk Road darknet marketplace is shown in the diagram below:

---

Aurum in the address as well as it's transactional relationship to the Mt. Gox account of AurumXchange indicates that this wallet cluster was a part of the AurumXchange operation.

9



38. That the November 10, 2015, financial transactions detailed in the first chart above included funds involved in, or traceable to funds involved in, Pilipis' unlawful operation of an unlicensed money transmitting business.

39. That the November 10, 2015, financial transactions also themselves constituted a concealment money laundering transaction in that:

   a. Pilipis knew that they involved proceeds of some form of unlawful activity;

   b. They included SUA proceeds, namely, proceeds of Pilipis' unlawful operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960; and

    c. Pilipis designed the transactions in whole and in part to conceal the nature, source, location, ownership, and control of the proceeds of Pilipis's specified unlawful activity.

40. Thus, as of November 10, 2015, that single wallet contained a total of at least 1,100 bitcoins.

41. Accordingly, as of that date, the 1,100 bitcoins in the wallet :

    a. Included funds involved in, or funds traceable to funds involved, in Pilipis's unlawful operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960; and also

    b. Consisted entirely of funds involved in, or funds traceable to funds involved in, financial transactions that Pilipis had engaged in to launder the proceeds of that specified unlawful activity of unlawfully operating an unlicensed money transmitting business for a concealment purpose, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) (concealment money laundering).

42. On or about February 28, 2018, Pilipis transferred approximately 200 of the 1,100 bitcoins from that wallet cluster into a custodial wallet held on ItBit, a bitcoin exchange, within an account held in Pilipis' name.

43. Those approximately 200 bitcoins included SUA proceeds, namely, funds traceable to Pilipis's unlawful operation of the unlicensed money transmitting businesses Aurum Capital Holdings business and AurumXchange.com website.

44. On or about February 28, 2018, Pilipis caused ItBit to convert those approximately 200 bitcoins into U.S. dollars, namely, into $2,148,563.

45. In 2019, in a federal income tax return that Pilipis filed with the Internal Revenue

Service, Pilipis claimed income from bitcoin sales that included the sale of the $2,148,563 worth of bitcoins through ItBit.

46. Pilipis's February 28, 2018, conversion of those 200 bitcoins into $2,148,563 therefore:

    a. Included funds involved in, or funds traceable to funds involved, in Pilipis's unlawful operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960; and

    b. Consisted entirely of funds involved in, or funds traceable to funds involved in, financial transactions Pilipis had engaged in to launder the proceeds of that specified unlawful activity for a concealment purpose, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

47. On or about February 28, 2018, Pilipis transferred nearly all of those funds to an account at Morgan Stanley held in Pilipis's name.

48. On or about March 6, 2018, almost all those funds (less a $20 transaction fee), namely the sum of $2,121,641.26, were transferred to ACCOUNT 1 held in Pilipis' name.

49. That March 6, 2018, transaction was a monetary transaction that constituted a spending money laundering violation under Title 18, United States Code, Section 1957.

50. That is because:

    a. Pilipis knowingly engaged in that monetary transaction through a United States financial institution, Morgan Stanley;

    b. That monetary transaction involved criminally derived property of a value greater than $10,000;

    c. The funds involved in that monetary transaction were in fact derived from specified unlawful activity—in that the transaction both: (1) included property valued at greater than $10,000 that was traceable to property involved in Pilipis's unlawful operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960, and (2) consisted entirely of property valued at greater than $10,000 that was involved in, and traceable to funds involved in, prior concealment money laundering transactions that Pilipis had engaged in to launder the proceeds of specified unlawful activity—his unlawful operation of an unlicensed money transmitting business, in violation of Section 1960—for a concealment purpose, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), which concealment money laundering conduct also constituted specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

51. Between October 28, 2018, and November 15, 2018, Pilipis caused 9 other transfers, totaling $11,557,114.13, to be made to ACCOUNT 1 from QCP Capital PTE LTD, a cryptocurrency exchange based out of Singapore. The diagram below, created with the assistance of the Chainalysis software, shows the flow of funds from bitcoin addresses affiliated with AurumXchange to a wallet cluster believed to be controlled by QCP Capital PTE LTD, the Singaporean cryptocurrency exchange from which Pilipis directed $11,557,114.13 to ACCOUNT 1:



52.     This diagram shows a similar pattern of bitcoin being transferred in increments of 100 into and out of different bitcoin addresses before ultimately being directed to a single wallet cluster, labeled as wallet #5.

53.     Analysis of the activity of wallet cluster #5 revealed characteristics, namely a substantial number of transactions, substantial amount of bitcoin transacted, and exposure to numerous other known cryptocurrency entities, activity which would be expected for a wallet cluster controlled by a service such as a cryptocurrency exchange, of which QCP Capital PTE

LTD is an example. Furthermore, the transfers into wallet #5 occur close in approximate time to the time period that Pilipis received the $11,557,114.13 to ACCOUNT #1 from QCP Capital PTE LTD.

54. In 2019, in a federal income tax return that Pilipis filed with the Internal Revenue Service, Pilipis claimed income from bitcoin sales through QCP Capital PTE LTD in the amount of $11,557,114.

55. For the reasons set forth in paragraphs 38-41 above, the transactions referenced in paragraphs 51-53 were concealment money laundering transactions involving proceeds of specified unlawful activity, namely, Pilipis's unlawful operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Section 1960.

56. Pilipis engaged in those concealment laundering transactions because they are designed to conceal the nature, source, ownership, location, and control of those proceeds—in particular, that Pilipis had obtained those proceeds through his unlawful operation of an unlicensed money transmitting business.

57. Pilipis then used the funds transferred to ACCOUNT 1 to, among other things, buy real estate and stocks and other investments. A portion of those funds were also used to pay the Internal Revenue Service. Later, a portion of the funds in Account 1 would be transferred to ACCOUNT 2.

58. On or about February 28, 2020, ACCOUNT 1 transferred $500,000 to ACCOUNT 2, also solely held in Pilipis's name. ACCOUNT 2 had a balance of $0 immediately before receiving that $500,000 transfer.

15

59. That transaction was a monetary transaction that constituted a spending money laundering violation under Title 18, United States Code, Section 1957, for the same reasons set forth in paragraph 49 above.

60. On the following dates, Pilipis transferred funds in the following amounts from ACCOUNT 1 to ACCOUNT 2:

   a. On June 25, 2020, $250,000;

   b. On June 30, 2020, $200,000;

   c. On November 23, 2020, $500,000;

   d. On January 20, 2021, $400,000;

   e. On May 17, 2021, $750,000;

   f. On May 19, 2021, $200,000; and

   g. On October 26, 2021, $400,000.

61. Each of those transactions was a monetary transaction that constituted a spending money laundering violation under Title 18, United States Code, Section 1957, for the same reasons set forth in paragraph 43 above.

62. Through at least the end of October 2022, these were the only credits that ACCOUNT 2 received.

63. Records from ItBit showed that, on or about March 6, 2018, Pilipis's account was accessed from IP Address 172.78.68.175. Based on a publicly available search for IP Address information, I learned that at this time, Frontier Communications managed that IP Address. Records obtained from Frontier Communications reflect that on March 6, 2018, this IP address was assigned to Max Pilipis at 25098 State Road 37 N., Noblesville, IN 46060, which records from Hamilton County, Indiana show is owned by Max and Lois Pilipis. This property is located

within the Southern District of Indiana.

64. Record from ItBit also showed that Pilipis's ItBit account was accessed on or about February 1, 2018, from IP Address 50.255.20.157. Based on a publicly available search for IP Address information, I learned that at this time, Comcast managed that IP Address. Records from Comcast reflect that on February 1, 2018, this IP address was assigned to Max Pilipis at 10609 Bur Oak Ct. OFC Home, Noblesville, IN 46060 on that date, which records from Hamilton County, Indiana show was owned by Max Pilipis and is now owned by Lois Pilipis.

65. *Use of Funds.* Records were obtained from Morgan Stanley related to the Accounts. The records state that on or about March 7, 2018, ACCOUNT 1 received a wire transfer of $2,121,621.26 (after the $20 fee) from the parent company of ItBit. At the time of this deposit, the balance of ACCOUNT 1 was $0.00. There were no additional significant deposits into ACCOUNT 1 until October 2018, when Account 1 began receiving deposits from what appear to be other bitcoin- related transactions from a Singaporean entity called "QCP Capital PTE LTD."

66. Between March and October 2018, the Morgan Stanley records pertaining to ACCOUNT 1 show that the $2,121,621.26 from ItBit was spent and invested in various ways.

67. As of September 30, 2018, the Morgan Stanley records pertaining to ACCOUNT 1 show that Pilipis held $658,397.46 in cash, $728,990.5 in equities, $ 428,587.74 in fixed income and preferred, and $200,653.50 in structured investments.

68. Records further show that on or about September 27, 2018, a wire transfer in the amount of $119,454.00 was made from ACCOUNT 1 to a real estate title company. Records from the Hamilton County, Indiana recorder's office reflect that shortly thereafter, in October 2018, a property located at 109 S. West Street, Arcadia, IN was deeded to Max and Lois

Pilipis.

69. Analysis of the **ACCOUNTS** revealed that the $2,121,621.26 that was transferred from Pilipis' ItBit account was commingled within ACCOUNT 1 with $11,557,111.13 that was received from a company called QCP Capital PTE LTD. These funds were received from QCP Capital PTE LTD via nine (9) wire transfers between the dates of October 26, 2018, and November 15, 2018. QCP Capital PTE LTD is a cryptocurrency exchange company that is based in Singapore.

70. From 2019 to the present additional deposits have been received to ACCOUNT 1. $14,000 was received to ACCOUNT 1 from an account that was held by Pilipis at Forum Credit Union (ACCOUNT 1 had transferred in excess of $14,000 to this same Forum Credit Union account prior to receiving this deposit). Later, ACCOUNT 1 received $802,995 from Standard Chartered Bank on January 19, 2021, and $1,423,708 from Signature Bank on May 10, 2021. It also received $30,000 from **ACCOUNT #2** on July 15, 2022 (**ACCOUNT #2** has only ever received funds from ACCOUNT 1). ACCOUNT #1 has also on 4 occasions received deposits from accounts with JPMorgan Chase Bank and Bank of America in amounts that are less than $1.

71. In total, ACCOUNT 1 received its' first external deposit on March 7, 2018, and through October 31, 2022, had received deposits totaling $15,949,439.75. Of these funds, $13,678,735.39 are derived from QCP Capital and ItBit as discussed in this report. $14,000.00 is derived from Pilipis' Forum Credit Union account which had at times previously received funds from ACCOUNT 1, $30,000 had been received from ACCOUNT 2, and the remaining $2,226,703.61 is derived from presently unknown sources. The balance of **ACCOUNT #1** as of January 31, 2023, is $6,268,912.74.

72. ACCOUNT 2 received its' first deposit on February 28, 2020, and has in total

received deposits totaling $3,200,000.00. It has received all of these funds from ACCOUNT 1. The balance of ACCOUNT 2 as of January 31, 2023, is $3,104,790.83.

## CONCLUSION

73. All allegations contained in paragraphs 1 through 72 are re-alleged and incorporated, herein, by reference.

74. The Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1956 or 1960.

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the Defendant funds as described above; that due notice be given to all interested persons to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property to be forfeited to that United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court.

Respectfully submitted,

ZACHARY A. MYERS
United States Attorney

By: _s/Kelly Rota_____
Kelly Rota
MaryAnn Mindrum
Assistant United States Attorneys
Office of the United States Attorney
10 W Market St., Suite 2100
Indianapolis, IN 46204-3048
Telephone: (317) 226-6333

## VERIFICATION

I, Jason L. Hays, Special Agent with the Internal Revenue Service, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Complaint for Forfeiture, in rem, is based upon reports and information furnished to me by law enforcement agents and that everything contained therein is true and correct to the best of my knowledge and belief.

Executed on this 17th November 2023.

*[signature]*

Jason L. Hays
Special Agent
Internal Revenue Service