# EXHIBIT A
# LAL AGREEMENT PILIPIS REDACTED

# Morgan Stanley

# Liquidity Access Line Application and Agreements - Individual(s) as Borrower

The Liquidity Access Line is offered by Morgan Stanley Private Bank, National Association

**Instructions:** Please review all information to ensure accuracy. All appropriate parties must sign this Liquidity Access Line Application and Agreements in the space(s) provided.

## Part A - Application Information

### Section I - Liquidity Access Line Request

**A) Your Line of Credit:**

☐ **Maximum Total Advance Limit:** Your line of credit advance limit will fluctuate based on the value and the loan advance rates of the securities in the collateral account(s). For further information about how maximum availability can fluctuate, refer to the approval letter that will be sent after the Liquidity Access Line is approved.

☑ **Request a Total Advance Limit:** By selecting this option your line of credit advance limit will be set to the lesser of (1) the amount indicated, or (2) the highest amount allowed based on the value and the loan advance rates of the securities in the collateral account(s). For further information about how a specific Total Advance Limit is established and can change, refer to the approval letter that will be sent after the Liquidity Access Line is approved.

Requested Total Advance Limit Amount: $10,000,000

**B) Primary Use of Funds:**

☐ Real Estate Purchase (Personal)      ☐ Real Estate Purchase (Commercial)      ☑ Tax Payments

☐ Primary Residence/Vacation           ☐ Home Improvements/Construction         ☐ Standby Liquidity

☐ Investment Property                  ☐ Education Costs                        ☐ Acquisition of a Business

☐ Commercial (Non Real Estate)         ☐ Luxury Purchase (boat, automobile,     ☐ Business Start-up or Expansion
                                         aircraft)
☐ Other: _____

### Section II — Borrower Information

If more than one person's information is entered below, each such person confirms his/her intention to be a joint borrower by signing below.

**Borrower**                                              **Co-Borrower**

MAXMILIANO      FRANCO         PILIPIS
FIRST NAME      MIDDLE INITIAL LAST NAME                  FIRST NAME          MIDDLE INITIAL   LAST NAME

▇▇  ▇▇                                                   _____

LEGAL ADDRESS/STREET ADDRESS (IF THE MAILING ADDRESS IS A PO BOX, THE    LEGAL ADDRESS/STREET ADDRESS (IF THE MAILING ADDRESS IS A PO BOX,
NEXT SECTION SHOULD BE COMPLETED)                                         THE NEXT SECTION SHOULD BE COMPLETED)

▇▇▇▇▇                        ▇  ▇▇
CITY                          STATE  ZIP CODE             CITY                          STATE   ZIP CODE

▇▇▇
DATE OF BIRTH                                             DATE OF BIRTH

            ▇▇▇▇▇

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                              ▇ 5764-245
                                                                      LAL NUMBER
Borrower Name

 LENLALIA          LAL

ID: ▇



LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 1 of 9
NY CS 9180795 05/18
▇ 5764-245

| HOME TELEPHONE NUMBER | WORK TELEPHONE NUMBER | HOME TELEPHONE NUMBER | WORK TELEPHONE NUMBER |

Please confirm that the Borrower(s) reside in the USA at least six months out of the year:  ☑ Yes   ☐ No

| If the Borrower's mailing address is different from the address of the Borrower's residence or is a PO Box, the following section should be completed. | If the Co-Borrower's mailing address is different from the address of the Co-Borrower's residence or is a PO Box, the following section should be completed. |

ADDRESS

ADDRESS

| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |

**Borrower**

**Co-Borrower**

Country of Citizenship:

Country of Citizenship:

☑ USA   ☐ Other (specify): _____

☐ USA   ☐ Other (specify): _____

If the Borrower does not have a Social Security number, passport information should be provided.

If the Co-Borrower does not have a Social Security number, passport information should be provided.

PASSPORT NUMBER

PASSPORT NUMBER

PASSPORT COUNTRY OF ISSUANCE

PASSPORT COUNTRY OF ISSUANCE

**Borrower Financial Information ($):**

**Co-Borrower Financial Information ($):**

1,000,000
TOTAL ANNUAL INCOME

TOTAL ANNUAL INCOME

10,000,000
LIQUID NET WORTH

LIQUID NET WORTH

15,000,000
TOTAL NET WORTH

TOTAL NET WORTH

software developer
OCCUPATION/SOURCE OF INCOME

OCCUPATION/SOURCE OF INCOME

Income derived in whole or part from alimony, child support or separate maintenance need not be revealed unless the applicant wishes to rely on it to establish creditworthiness.

1. Is the Borrower or Co-Borrower currently an employee, officer or member of the Board of Directors of Morgan Stanley or any of its affiliates or subsidiaries?

   ☑ No   ☐ Yes   If yes, please list the name of the Morgan Stanley entity, location and the title at such entity:

   _____

2. Are any of the Borrower's or Co-Borrower's immediate family members (defined as child, step-child, parent, step-parent, spouse, sibling, domestic partner or any in-laws), now an employee, officer, or member of the Board of Directors of Morgan Stanley or any of its affiliates or subsidiaries?

   ☑ No   ☐ Yes   If yes, please list the name of the Morgan Stanley entity, location and the title at such entity:

   _____

3. Is the Borrower, Co-Borrower, or any spouse or relative of such person or any relative of such spouse sharing their household, a director, 10% or greater shareholder, policymaking executive officer or executive officer for a publicly traded firm?

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS _____   ▮▮ 5764-245

Borrower Name                                           LAL NUMBER

LENLALIA        LAL *Original*        LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
                                                          (05/2018)
ID: ▮▮▮                                                    Page 2 of 9
                                                        NY CS 9180795 05/18
                                                          ▮▮ 5764-245

☑ No  ☐ Yes   If yes, please explain: _____

_____

4. Is the Borrower or Co-Borrower a candidate (or member of a candidate's household) for, or holder of, federal, state or local elective office?

☑ No  ☐ Yes   If yes, please explain: _____

_____

Please specify the office and the scheduled election date or the date elected to office.

Office: _____   Date elected: _____

If yes, the Borrower or Co-Borrower must provide Morgan Stanley Private Bank, National Association with a separate letter confirming the proceeds received from the Liquidity Access Line will not be used for campaign purposes or to pay debt incurred by a campaign.

5. Is the Borrower or Co-Borrower a Politically Exposed Person ("PEP")? A PEP is generally defined as a current or former prominent public figure, an immediate family member of a prominent public figure, or a known close associate of a prominent public figure. The term "prominent public figure" is a senior official in the executive, legislative, administrative, military or judicial branches of government (whether elected or not), a senior official of a major political party, or a senior executive of a government-owned corporation. The term "immediate family member" typically includes spouse/partner, parent, grandparent, sibling, child, step-child, or in-law. The term "known close associate" is a person who is widely and publicly known to maintain a close relationship with the prominent public figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the prominent public figure.

☑ No  ☐ Yes   If yes, Political Official's Name: _____

Current/Former Position: _____

Relationship to Client: _____

Country of Residence: _____

6. Has the Borrower or Co-Borrower had any judgments, bankruptcy, convictions/plea deals for criminal or civil offenses, or other legal proceedings against the Borrower or Co-Borrower?

☑ No  ☐ Yes   If yes, please explain: _____

_____

7. Is the Borrower or Co-Borrower a Guarantor on any other obligations, have any contingent liabilities, owe taxes, or currently party to a lawsuit?

☑ No  ☐ Yes   If yes, please explain: _____

_____

8. Does the Borrower or Co-Borrower have an interest (including, without limitation, by ownership, voting, common parent or shared management) in any other party, who currently has a loan with Morgan Stanley Private Bank, National Association or any of its affiliates?

☑ No  ☐ Yes   If yes, please explain: _____

_____

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS _____   5764-245

Borrower Name                                                      LAL NUMBER

*Original*

LENLALIA        LAL                                LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER

ID: ████                                                         (05/2018)
                                                                  Page 3 of 9
                                                                  NY CS 9180795 05/18
                                                                  5764-245

9. Does the Borrower or Co-Borrower have any business relationship with any other party, who currently has a loan with Morgan Stanley Private Bank, National Association or any of its affiliates, that accounts for more than 50% of the Borrower or Co-Borrower's revenue or expenses?

☑ No   ☐ Yes   If yes, please explain: _____

_____

10. Does the Borrower or Co-Borrower, together with any other party, who currently has a loan with Morgan Stanley Private Bank, National Association or any of its affiliates, own more than 50% of the voting interest in any 3rd party?

☑ No   ☐ Yes   If yes, please explain: _____

## Section III — Collateral Accounts

Information for each Morgan Stanley Smith Barney LLC account to be pledged by Borrower, Co-Borrower or any Third Party Pledgor to secure the Liquidity Access Line is inserted below. Please be aware that any account pledged as collateral for a Liquidity Access Line will no longer have margin capabilities. Contact your Financial Advisor or Private Wealth Advisor to discuss alternatives.

| Full Account Title | Branch | Account Number | FA Number/ PWA Number |
|---|---|---|---|
| MAXMILIANO FRANCO PILIPIS | ■ | ■1821 | 245 |

**Restricted and/or Control Stock** - If any of the collateral accounts contain Restricted and/or Control Stock, please check the following box: ☐

If you are also requesting loan value for Restricted and/or Control Stock in any of the collateral accounts, please check the following box: ☐

## Section IV - Required Documents

As part of the loan review process, the Borrower and Co-Borrower should provide copies of the following documents with the application:

**Borrower / Co-Borrower**

**1.** If the loan request is greater than $10,000,000, you may have to complete the Financial Statement.

**2.** If the Borrower and/or Co-Borrower does not have a Social Security Number, please provide a copy of the full passport for such person.

**Pledgors**

**1.** If the loan request is greater than $10,000,000, you may have to complete the Financial Statement.

**2.** If the Pledgor does not have a Social Security Number, please provide a copy of the full passport for such person.

**3.** Please contact your Financial Advisor or Private Wealth Advisor for any additional documentation requirements.

Additional requests for documentation may be made to a Borrower and/or a Co-Borrower orally or in writing during the application process.

## Section V — Important Regulatory Considerations

**Important information about procedures for opening a new account or establishing a new customer relationship.**

To help the U.S. government fight the funding of terrorism and money-laundering activities, Federal law requires all U.S. financial institutions to obtain, verify and record information that identifies each individual or institution that opens an account or establishes a customer relationship with Morgan Stanley Smith Barney LLC and/or Morgan Stanley Private Bank, National Association

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                        ■ 5764-245

Borrower Name                                                    LAL NUMBER

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER

LENLALIA         LAL                                             (05/2018)
                                                                Page 4 of 9
ID: ■                                                     NY    795 05/18
                                                                5764-245

*Original*

**What this means:** If you enter into a new customer relationship with Morgan Stanley Smith Barney LLC and/or Morgan Stanley Private Bank, National Association, Morgan Stanley Smith Barney LLC and/or Morgan Stanley Private Bank, National Association will ask for your name, address, date of birth (as applicable) and other identification information. This information will be used to verify your identity. As appropriate, Morgan Stanley Smith Barney LLC and/or Morgan Stanley Private Bank, National Association may, in its discretion, ask for additional documentation or information. If all required documentation or information is not provided, Morgan Stanley Smith Barney LLC and/or Morgan Stanley Private Bank, National Association may be unable to open an account or maintain a relationship with you.

**Notice:** The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20006.

## Section VI — State Specific Provisions

**For Residents of California:** Any person, whether married, unmarried, or separated, may apply for a separate loan.

**For Residents of New York:** A consumer report may be requested in connection with your application. Upon your request, we will inform you whether or not a consumer report was requested, and if so, the name and address of the consumer reporting agency that furnished the report. Subsequent consumer reports may be requested or utilized in connection with an update, renewal or extension of the credit for which you are applying.

**For Residents of Rhode Island:** A consumer credit report may be obtained in connection with your application.

*This Liquidity Access Line Application and Agreements is not deemed received and accepted by Morgan Stanley Private Bank, National Association until actual delivery to Morgan Stanley Private Bank, National Association occurs. Delivery of this Liquidity Access Line Application and Agreements to your Financial Advisor or Private Wealth Advisor will not be considered receipt or acceptance by Morgan Stanley Private Bank, National Association.*

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS

Borrower Name

LENLALIA            LAL

ID: ▮▮▮▮




▮▮5764-245

LAL NUMBER

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 5 of 9
NY CS 9180795 05/18

▮▮5764-245

## Part B – Loan Agreement

This LOAN AGREEMENT is entered into between each person signing below as the Borrower (and as the Co-Borrower if applicable) (individually or together, referred to herein as "you" or "your") and Morgan Stanley Private Bank, National Association, a national banking association (together with its successors and assigns, as applicable, referred to herein as "Bank"). The "LAL Agreement" means, collectively, (i) this Liquidity Access Line Application and Agreements and (ii) the Liquidity Access Line Terms and Conditions provided to you along with this Liquidity Access Line Application and Agreements and incorporated by reference herein (the "Terms and Conditions"), each as modified, amended or supplemented from time to time. "Morgan Stanley Smith Barney" means Morgan Stanley Smith Barney LLC and its successors and assigns, as applicable. **THE LAL AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON THE EARLIER OF (I) WRITTEN NOTICE TO YOU FROM BANK THAT THE LIQUIDITY ACCESS LINE HAS BEEN APPROVED AND READY FOR USE OR (II) BANK MAKING AN ADVANCE TO YOU OR ISSUING A LETTER OF CREDIT ON YOUR BEHALF (THE "EFFECTIVE DATE"). UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE, THE LAL AGREEMENT WILL BE OF NO FORCE OR EFFECT AND NOTHING HEREIN SHALL BE DEEMED APPROVAL OF YOUR APPLICATION FOR A LIQUIDITY ACCESS LINE.** By signing below, you agree to be bound by the terms and conditions of the LAL Agreement, including all schedules and exhibits hereto, and all other Loan Documents to which you are a party.  You further understand, acknowledge and agree as follows:

1.  **Defined Terms.** Capitalized terms used but not defined herein shall have the meanings provided in the Terms and Conditions.

2.  **Except as provided in Section 1(E) of the Terms and Conditions, the Liquidity Access Line is a demand line of credit.** Accordingly, Bank may at any time, in its sole discretion and without cause, demand that Borrower immediately repay any and all outstanding LAL Obligations in whole or in part, whereupon Borrower shall be obligated to repay immediately all such LAL Obligations, even if no Stated Event has occurred.

3.  **Except as provided in Section 1(E) of the Terms and Conditions, Bank is not committed to make any Advance or issue any Letter of Credit hereunder, and may decline to make any such extension of credit in its sole discretion.**

4.  **Subject to the provisions of the Terms and Conditions, unless you authorize Bank to initiate Automatic ACH Payments or Automatic Internal Payments to make payments on Fixed Rate Advances, payments on Fixed Rate Advances are accomplished by making a Variable Rate Advance in an amount equal to the payment then due on such Fixed Rate Advance(s), applying the Variable Rate Advance as a payment to the Fixed Rate Advance(s) and applying Borrower's payment (if any) to the Variable Rate Advance. Any such Variable Rate Advance will bear interest at a variable rate as set forth in the Terms and Conditions, and such rate of interest may be higher or lower than the rate on the Fixed Rate Advance.**

5.  You shall not allow any Advances or Letters of Credit under the Liquidity Access Line to be used, and you hereby represent and warrant that no portion of the proceeds of the Liquidity Access Line will be used: (1) to purchase, carry or trade any "margin stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve ("Reg U") or to extend credit to others for the purpose of purchasing, carrying or trading any margin stock; or (2) to repay debt used to purchase, carry or trade in any margin stock. To further confirm the matters set forth in this Section 5, you will be required to certify on Federal Reserve Form U-1 that no portion of the proceeds of the Liquidity Access Line will be used to purchase or carry margin stock (such certification along with your representation and agreement pursuant to this Section 5 being referred to herein as your "Non-Purpose Undertakings").  In extending credit to you under the Liquidity Access Line, Bank will be expressly relying on your Non-Purpose Undertakings.  Each of your signatures where indicated below and on your Federal Reserve Form U-1 and your request for any Advance under the Liquidity Access Line will constitute your acknowledgment that you fully understand your Non-Purpose Undertakings and agree to be bound thereby in all respects.  Before you provide your Non-Purpose Undertakings, please carefully read the additional disclosure set forth immediately below.

    One of Bank's obligations when making loans secured by certain securities, such as U.S. listed equity securities, is to obtain a representation from the Borrower as to the purpose of the loan.  Below is a summary of the background of this representation.  This summary is general in nature and does not attempt to cover all relevant details that you should consider in providing your Non-Purpose Undertakings.  In addition, this summary does not constitute, and should not be relied upon as, legal advice.  Without limiting the generality of Section 14 below, if you have any questions regarding the representation we are asking you to provide, we encourage you to consult with your legal and other advisors before providing the representation. The reason for obtaining a representation as to the purpose of the loan is to confirm compliance with margin  regulations that are applicable both to Bank (Reg U) and to you (Regulation X issued by the Board of Governors of the Federal Reserve System).  In general, if the Borrower is obtaining "purpose credit" that is secured by "margin stock," these regulations limit the amount of credit that may be obtained.

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS
BORROWER NAME

764-245
LAL NUMBER

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 6 of 9
NY CS 9180795 05/18

LENLALIA          LAL
ID:

5764-245

"Margin stock" includes a wide range of securities, such as the following:

- Equity securities traded on a U.S. national securities exchange (for example, the New York Stock Exchange or NASDAQ), either directly or through American depositary receipts (ADRs);
- Certain over-the-counter securities;
- Debt securities that are convertible into margin stock or that carry rights or warrants to subscribe to or purchase margin stock;
- Warrants or rights to subscribe to or purchase margin stock; and
- Securities issued by registered investment companies such as mutual funds (but excluding, for example, certain money market funds and certain government bond funds).

"Purpose credit" is broadly defined and includes credit to buy margin stock as well as credit to "carry" margin stock, such as when the loan is used to refinance another loan originally incurred to buy margin stock. A loan constitutes purpose credit if it is for the immediate, incidental or ultimate purpose of buying or carrying margin stock. For example, purpose credit may include:

- using loan proceeds to buy assets that are not margin stock, but then selling those assets and using the proceeds to buy or carry margin stock;
- temporarily using loan proceeds to invest in margin stock pending use of the proceeds for another purpose;
- using loan proceeds to lend to another person who uses the proceeds to buy or carry margin stock; or
- investing in an equity security that is convertible into margin stock.

6.  You shall not allow any Advances or Letters of Credit under the Liquidity Access Line to be used: (1) to repay any debt to Bank or any affiliate of Bank; or (2) in connection with any illegal transaction.

7.  **Borrowing by using securities as collateral involves a high degree of risk. Securities-based borrowing is not for everyone. If it is not suitable for you, you should not open a Liquidity Access Line. You should examine your investment objectives, financial resources and risk tolerance to determine whether securities-based borrowing is suitable for you. Bank can take action with respect to the Collateral Account, without prior notice to you, such as requiring immediate repayment of the LAL Obligations, issuing a collateral call or selling the assets in the Collateral Account to maintain the required equity in the Collateral Account or to repay the LAL Obligations. This may occur, for example, if Bank in its sole discretion determines that the securities in the Collateral Account are (or may become) insufficient Collateral for the Liquidity Access Line for any reason, such as due to a decline in the value or the loan advance rate for the securities in the Collateral Account, and the LAL Obligations are not reduced or additional Collateral satisfactory to Bank is not provided. Bank reserves the right to disapprove any Collateral and to require additional Collateral to be deposited into the Collateral Account at any time in the amount requested by Bank or to require substitution of new or additional Collateral to replace any Collateral previously deposited in the Collateral Account.**

8.  **While Bank may attempt to notify you regarding a deficiency with respect to the Collateral in the Collateral Account, Bank is not obligated to do so. Bank may in its sole discretion, to the extent permitted by applicable law, liquidate securities, regardless of issuer closed windows or blackouts, and other property to satisfy collateral requirements for the Liquidity Access Line, without notice to you and without requesting additional Collateral. These liquidations may cause you to recognize taxable income or to report losses for tax purposes. Bank may perform such transactions, to the extent permitted by applicable law, without prior notice or advertisement on the market where such business is usually transacted, at a public auction or in a private sale, including transactions with Bank or Morgan Stanley Smith Barney for their own account. To the extent permitted by applicable law, you waive any right of redeeming the proceeds of such transactions without Bank's consent and agree not to hold Bank liable for taking such actions. Without limiting the foregoing, to the extent permitted by applicable law, Borrower waives any right to the notice of sale of Collateral, advertisement of such sale and any related provisions of applicable law, including, but not limited to the Uniform Commercial Code.**

9.  **Section 15 of the Terms and Conditions (Dispute Resolution) includes a waiver of a number of rights, including the right to bring a lawsuit in court, the right to serve as a representative in a class action and the right to a jury trial. That section also describes the procedure you must follow if you desire to reject the Dispute Resolution section.**

10. Bank may, at any time, amend, supplement or modify the LAL Agreement, including, but not limited to, by changing the Variable Rate Index, the Fixed Rate Index, the Interest Spread, Letter of Credit Fees and any other fees and other charges payable in connection with the Liquidity Access Line.

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS

BORROWER NAME



5764-245

LAL NUMBER

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER (05/2018)
Page 7 of 9
NY CS 9180795 05/18

LENLALIA          LAL

ID:

5764-245

11. The total interest, fees and other charges on the Liquidity Access Line may exceed the investment performance of the Collateral Account.

12. The Collateral Account will **not** have margin privileges during the period that the Collateral Account is pledged to Bank as Collateral for the Liquidity Access Line. You can continue to use your current checks and debit cards with respect to the Collateral Account so long as you have sufficient cash to cover such transaction.

13. If the Bank establishes a Liquidity Access Line on your behalf, Morgan Stanley Smith Barney will have concurrently established an LAL Facilitation Account on your behalf pursuant to the terms of the LAL Facilitation Account Agreement. Pursuant to Section 8 of the LAL Facilitation Account Agreement, you will have access to certain cash management services through your LAL Facilitation Account, including check writing privileges with respect to your Liquidity Access Line, subject in all respects to the terms of the LAL Agreement.

14. **None of Bank, Morgan Stanley Smith Barney, your financial advisor ("Financial Advisor") nor private wealth advisor ("Private Wealth Advisor"), as applicable, provides tax or legal advice.** You should consult your own attorney, tax advisor or accountant for matters involving taxation, tax planning, personal trusts and estate planning or the legal consequences of entering into the LAL Agreement.

15. Notwithstanding any advisory relationship that you may have with Morgan Stanley Smith Barney in connection with the Collateral Account, you will not have an advisory relationship with Morgan Stanley Smith Barney or Bank with respect to the Liquidity Access Line, the LAL Facilitation Account or your decision to use the Collateral Account as Collateral for the Liquidity Access Line. None of Bank, Morgan Stanley Smith Barney or your Financial Advisor or Private Wealth Advisor, as applicable, is acting as an investment adviser in connection with your decision to obtain a Liquidity Access Line and you are solely responsible for the decision to enter into the LAL Agreement and to pledge assets held in the Collateral Account.

16. You have received the Morgan Stanley Smith Barney, Bank, Morgan Stanley Bank, N.A. ("**MSBNA**") and Morgan Stanley Commercial Financial Services LLC ("**CFS**") Privacy Notice (the "**Morgan Stanley Privacy Notice**") which explains certain important rights with respect to any private information that you may provide to (1) Bank, (2) Morgan Stanley Smith Barney, in connection with your LAL Facilitation Account, or (3) MSBNA, if the loan is assigned from Bank. You agree that you have read and understood the Morgan Stanley Privacy Notice. You consent and agree that Bank may (i) share information regarding your Liquidity Access Line with any Loan Party or any party with access to the Loan Party's account information (e.g. through an account linked group) and (ii) provide copies of Loan Documents to any Loan Party.

17. Morgan Stanley Smith Barney and your Financial Advisor or Private Wealth Advisor may have a conflict of interest in connection with your decision to obtain a Liquidity Access Line, in so far as they and their affiliates earn income in connection with the Liquidity Access Line. In addition, the compensation earned by your Financial Advisor or Private Wealth Advisor will fluctuate with the applicable interest rate and outstanding balance on your Liquidity Access Line. You understand that your Financial Advisor or Private Wealth Advisor, as applicable, and Morgan Stanley Smith Barney may have a financial incentive for you to enter into the Liquidity Access Line as opposed to obtaining other lending products offered by Morgan Stanley Smith Barney.

18. Actions taken by Bank, acting in its capacity as the lender, and Morgan Stanley Smith Barney, acting in its capacity as securities intermediary, may be directly contrary to your interests as owner of the Collateral Account and the LAL Facilitation Account and Bank's and/or Broker's actions, including selling securities in the Collateral Account or requesting that additional collateral be deposited in the Collateral Account, may have adverse consequences for you, including realizing taxable gains as a result of any such sale and affecting your asset allocation, cash flow, trading activity and investment strategy.

19. If and to the extent that Bank permits instructions regarding the Liquidity Access Line to be delivered orally, Bank may accept instructions from your Financial Advisor or Private Wealth Advisor in connection with your Liquidity Access Line, in which case such instructions will be deemed to have been given or made directly by you.

20. Bank may at any time request, and you must then provide, additional financial information in connection with extending or maintaining the Liquidity Access Line.

21. After considering the benefits and risks of the use of the Liquidity Access Line, you have determined that it is appropriate based on your financial situation and investment objectives.

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS ███████ 5764-245

BORROWER NAME                                          LAL NUMBER

~~Original~~

LENLALIA        LAL

ID: ███████

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER (05/2018)
Page 8 of 9
NY CS 9180795 05/18

███████ 5764-245

By signing below, you acknowledge, agree and confirm that (1) you have received a fully executed copy of the LAL Agreement, have reviewed and understand the terms set forth therein and agree to be bound thereby in all respects and (2) you have authorized Bank or anyone authorized by Bank to obtain a credit report and other credit references to verify the accuracy of the information in this Liquidity Access Line Application and Agreements and to determine your creditworthiness, both in connection with this Liquidity Access Line Application and Agreements and at any time during the term of the Liquidity Access Line. If more than one person is signing below, each such person confirms his/her intention to be a joint borrower by signing below.

| Signature of Borrower | Signature of Co-Borrower |
|---|---|
| Signature ✗ PLEASE SIGN HERE | Signature ✗ PLEASE SIGN HERE |
| MAXMILIANO FRANCO PILIPIS | |
| Print Name | Print Name |
| 5|17|2019 | |
| Date | Date |

## Part C - Liquidity Access Line Facilitation Account Agreement

**Liquidity Access Line Facilitation Account Agreement Signatures**

Your accounts at Morgan Stanley Smith Barney LLC are governed by a pre dispute arbitration clause (see Section 10 on page 6 of the attached Liquidity Access Line Facilitation Account Agreement). You acknowledge that you have received a copy of the Liquidity Access Line Facilitation Account Agreement, including the pre dispute arbitration clause.

By signing below you acknowledge receipt of and agree to the terms of the Liquidity Access Line Facilitation Account Agreement which by this reference is incorporated herein.

| Signature ✗ PLEASE SIGN HERE | Signature ✗ PLEASE SIGN HERE |
|---|---|
| MAXMILIANO FRANCO PILIPIS | |
| Print Name | Print Name |
| 5|17|2019 | |
| Date | Date |

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS

5764-245

BORROWER NAME

LAL NUMBER

# Morgan Stanley

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 9 of 9
NY CS 9180795 05/18

Original

LENLALIA        LAL

ID:

5764-245

# Morgan Stanley

# Liquidity Access Line Facilitation Account Agreement

In the following agreement, the words "we," "us," "our" and "MSSB" refer to Morgan Stanley Smith Barney LLC. The words "you," "your," "yours" and "client" refer to the account owner.

Your Liquidity Access Line Facilitation Account (your "LAL Facilitation Account") is a limited-purpose brokerage account at MSSB. The sole purpose of your LAL Facilitation Account is to facilitate administration by Morgan Stanley Private Bank, National Association and/or another of our bank affiliates ("Bank Lender") of a Liquidity Access Line line of credit (an "LAL Line of Credit"), including, without limitation, advances and repayments thereunder. Should Bank Lender, in its sole discretion, approve your application for an LAL Line of Credit, your LAL Line of Credit would be governed by the terms of a separate Liquidity Access Line Agreement with Bank Lender and related terms and conditions (collectively, your "LAL Agreement"). Unlike other account(s) that you may maintain with us, you cannot carry out many common brokerage activities through your LAL Facilitation Account, including, without limitation, buying and selling securities or holding cash or other property that is unrelated to your LAL Line of Credit. You hereby authorize us to immediately take all such actions as we may deem necessary or advisable to cancel and/or unwind any securities trades that may inadvertently be made in your LAL Facilitation Account. You will have the ability to access funds that are available to you under your LAL Line of Credit and to cause amounts outstanding under your LAL Line of Credit to be repaid through your LAL Facilitation Account, including by writing checks or using one or more of the other cash management services described in Section 8 below. By signing below, you hereby authorize us to share the terms of this Agreement with Bank Lender and its employees and agents. You also authorize Bank Lender to share the terms of your LAL Agreement with us and our employees and agents (i.e. consultant or contingent worker). If your LAL Agreement is terminated for any reason or Bank Lender otherwise terminates your LAL Line of Credit, we reserve the right to immediately close your LAL Facilitation Account, unless otherwise prohibited by applicable law or regulation. Neither the terms of this Agreement nor the establishment of your LAL Facilitation Account constitute any commitment by or on behalf of Bank Lender or any of its affiliates to extend credit.

The provisions of this Agreement shall be continuous. Your heirs, executors, administrators, assigns or successors will also be bound by the terms of this Agreement, as will any successor organization or assign of MSSB. Except for the statute of limitations applicable to claims, this Agreement is governed by the laws of the State of New York (and, with respect to IRAs and CESAs, the provisions of the U.S. Internal Revenue Code of 1986, as amended, and any successor tax statutes (the "Code")), without giving effect to principles of the conflict of laws. If any provision of this Agreement becomes inconsistent with any applicable current or future law, rule or regulation, that provision will be deemed changed to conform to the law. However, all other provisions will remain in effect. If any provision of this Agreement is determined by competent authority to be prohibited or unenforceable in any jurisdiction, that provision shall be deemed ineffective in that jurisdiction without invalidating the rest of this Agreement, nor rendering such provision invalid or unenforceable in any other jurisdiction.

Unless otherwise required by applicable law, and except as set forth in this Agreement or in other disclosures provided to you, neither we nor any other entity performing services in connection with this Agreement will be liable for consequential, special or indirect damages or losses. This Agreement does not confer any rights on any third parties, including any Authorized Check Signers (as referred to in your Client Agreement for Active Assets Accounts).

You agree that our failure to insist at any time upon strict compliance with any term of this Agreement, or any delay or failure on our part to exercise any power or right given to us in this Agreement, or a continued course of such conduct on our part shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to us in this Agreement are cumulative and not exclusive of any other rights or remedies which we otherwise have.

MSSB may amend, supplement, modify or rescind any and all provisions of this Agreement, and, unless they are adverse to you or notice is required either by the provisions of applicable law or other governing agreements applicable to your account, such changes will take effect without notice to you. If, however, such changes are adverse to you, we will provide you with notice in accordance with applicable regulations before such changes take effect. Subject to the requirements of applicable law, MSSB may sell, transfer or assign this Agreement, in whole or in part, at any time with or without notice to you. You may not sell, assign or transfer any of your obligations under this Agreement without the express written consent of MSSB.

We may, with or without notice to you, decline to offer you certain services or cancel existing services available under this Agreement at our sole discretion consistent with the requirements of applicable law and other governing agreements applicable to your account.

You acknowledge that all agreements hereunder may be executed in counterparts. Certain features of your account may be subject to additional applications and agreements that also govern or supplement this Agreement, all of which collectively govern your relationship with MSSB.

## 1. Communicating with You

From time to time, but no less frequently than quarterly, we will send you statements for your account. We will also send you transaction confirmations as required by law or regulation. We will keep on file for you a mailing address that you provide (including an email address if so provided), and will use the address specified by you or any updated address you provide, to send you written communication by mail or other methods with respect to your LAL Line of Credit. We will consider any communication delivered to that address as delivered to you personally. You must notify us immediately of any change to your mailing or email address. If MSSB becomes aware of a change of your mailing address through notification from the US Postal Service, it may update its records accordingly, however, MSSB has no obligation to you to update your mailing address unless you have personally notified us of the address change.

You acknowledge that the rules of the Securities and Exchange Commission (the "SEC") require that certain communications be sent to you rather than to an agent acting on your behalf. You warrant that the address specified by you is an address where you personally receive communications unless it is the address of a qualified custodian as defined by the SEC.

LENLALIA       LAL

ID: █████

Keep This For Your Records

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 1 of 6
CS 9180795 05/18
5764-245

You acknowledge that if you have provided instructions to link your account(s) with separate accounts of others, your personal and financial information may be provided to such other account owners by virtue of your account(s) being linked.

If you have designated another individual to receive your communications from us pursuant to an alternative mail instruction, you agree that the instruction is applicable to all communications (except certain regulatory mandated communications) including but not limited to proxies, prospectuses, confirmations and statements of account. In consideration of MSSB accepting and acting upon that instruction, you agree that all such communications shall be deemed for all purposes to have been personally received by you on the date indicated in such communication. You further agree to indemnify and hold harmless MSSB, its officers, directors and employees from any and all liabilities arising from MSSB's compliance with these instructions and you hereby specifically waive any claims from your election not to promptly review transactions posted to your account.

Transactions entered into for your account(s) shall be confirmed in writing to you where required by applicable law or regulation. You agree that transactions on your statements and confirmations shall conclusively be deemed accurate, accurate and authorized by you unless you notify us in writing, within three (3) days of receipt for confirmations and ten (10) days of receipt for statements. Even if you have verbally advised us of any inaccuracy or unauthorized activity, you must send written notice by letter or mail of the believed inaccuracy to the manager of the branch office servicing your account. Failure to so notify MSSB in writing will preclude you from asserting at a later date that such transaction was inaccurate or unauthorized.

You understand and agree that the property in your account(s) may be transferred to the appropriate state if we are unable to contact you by mail or email and no activity has occurred in the account within the time period specified by state law.

## 2. Electronic Delivery

If you request electronic delivery, you understand and agree that you are providing blanket authorization to discontinue hard-copy delivery of most documents relating to your MSSB account(s) and begin electronic delivery to the email address you provide. Documents include but are not limited to your account statements, account documentation (including your client agreements and amendments to such), and all documents that may be added to eDelivery in the future (collectively "eDelivery Documents"). When you enroll in eDelivery, you consent to the electronic delivery of all eDelivery Documents and further agree and understand that you will not receive and we are not obligated to provide paper copies of such eDelivery Documents. By selecting eDelivery, you are providing your informed and positive consent to receive eDelivery Documents electronically by accessing them on an MSSB or other third-party website selected by MSSB after being electronically notified by email that the eDelivery Documents are available for your review. After enrollment, you will receive enrolled eDelivery Documents in electronic form rather than by physical delivery.

You consent that when you select a document by type to be electronically delivered for all of your existing linked accounts, that document type will be electronically delivered for any accounts you may open in the future which are then linked to your existing accounts. If you do not select electronic delivery for a document type for all of your accounts, then that document type will not be automatically enrolled for electronic delivery for accounts you may open in the future.

You consent to be notified by email to the address you provide that an eDelivery Document is available on our secure website or a third-party website. The email address that you provide will be used to provide notifications of document availability to you for all selected accounts and document types for your Morgan Stanley Online username.

If at any time we are unable to deliver email notifications to your email address, you understand that:

• We will notify you by regular mail.

• Depending on the reason for the delivery failure, we may immediately suspend eDelivery for the accounts and documents enrolled under your username/email address, resulting in physical delivery of eDelivery documents until such time that you revalidate your email address.

You understand that certain risks are associated with the transmission of confidential information, electronic delivery notifications, and other communications through the Internet including, but not limited to, unauthorized access, systems outages, delays, disruptions in telecommunications services and the Internet. Email is not private or secure. The electronic delivery notices sent to you by email are not encrypted. Although such electronic delivery notices are not intended to contain personally identifiable information, they may contain in their design part or all of your name or other identifier that could be seen or intercepted by others if delivered to your business email address or other computers or electronic devices not exclusively under your control. You understand and agree that you will not respond to the electronic delivery notice by return email, or use it to request information, service, paper copies or other items or to revoke consent. MSSB will not be responsible to act upon requests made in this manner.

Although electronic documents are provided without charge, you understand that other online subscription or access fees by Internet service providers may apply. You must maintain the ability to access and open electronic documents. There are minimum computer hardware and software requirements necessary to receive and view your electronic documents, including, but not limited to, an Internet connection and Internet browsing software. You may request a paper copy of any document delivered through eDelivery but you may incur a charge for that copy. MSSB will maintain an electronically accessible archive of your eDelivery documents on our secure client website for seven (7) years after document publication. If you wish to retain eDelivery documents for a longer period of time, you are responsible for archiving beyond seven (7) years. You agree that, notwithstanding a request for electronic delivery of eDelivery Documents, we may in our sole discretion send you copies of documents in hard copy form.

## 3. Transactions

All transactions entered into under this Agreement, including, without limitation, all transactions with respect to your LAL Line of Credit, shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by MSSB or its agents and to all applicable laws, rules and regulations of governmental authorities and self-regulatory agencies. Such reference to the "constitution, rules, regulations, customs and usages of the exchange" shall in no way be construed to create a cause of action arising from any violation of such constitution, rules, regulations, customs and usages.

Original

LENLALIA          LAL                              Keep This For Your Records

ID:

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 2 of 6
NY CS 9180795 05/18

5764-245

In the event of a dispute between parties with conflicting claims as to the ownership of your account, we may refuse to accept instructions for transactions in the account other than joint instructions.

If you have received payment of funds to which you were not entitled or to which you are subsequently not entitled ("erroneous payment"), you agree to notify us as soon as you learn of such erroneous payment and you further agree not to remove any such erroneous payment from the Account, and to return the entire erroneous payment to us. You agree that you are required to return the full amount of the erroneous payment to us, notwithstanding any oral representations to the contrary made by any of our personnel.

Additionally if you fail to return the erroneous payment, we shall have the right to remove an amount equal to the erroneous payment from your Account and to liquidate any assets held by us to satisfy your obligations to return any such erroneous payment.

If we cannot remove the erroneous payment from your account and you fail to return the full amount of the erroneous payment to us, you will become liable to us not only for the amount of the erroneous payment but also for any interest and expenses (including reasonable attorney's fees) associated with the recovery of the erroneous payment.

By making any repayment of amounts outstanding under your LAL Line of Credit, in whole or in part, through your LAL Facilitation Account, you hereby irrevocably authorize and direct MSSB to transfer such repayment to Bank Lender as soon as practicable in accordance with applicable law and regulation. You acknowledge and agree that you may not subsequently rescind or cancel any such repayment made through your LAL Facilitation Account.

## 4. Restrictions and Account Termination

You agree that we may in our sole discretion and without notice to you, to the extent permissible under applicable law and other governing documents applicable to your account or your LAL Line of Credit, decline, cancel or reverse your orders or instructions, or place disbursement and other restrictions on any of your accounts. We may hold property in any of your accounts if it is necessary to comply with governmental requests or to protect either your or our interests. The provisions of this Agreement will continue to apply to accounts that have been closed.

You agree that we may also in our sole discretion and without notice to you, to the extent permissible under applicable law and other governing documents applicable to your account, terminate or otherwise restrict any or all services rendered under this Agreement at any time and for any reason. You may close your LAL Facilitation Account at any time that your LAL Line of Credit has not yet been established or has been terminated and your LAL Facilitation Account is not otherwise required to administer your LAL Line of Credit, in each case in our sole determination, by giving MSSB notice. When you instruct us to close your account, we may immediately terminate all services provided to your account, including, without limitation, your ability to write checks. You understand that we may at our option require you to return all unused checks to us, or to destroy them. We may hold your funds until you have returned all unused checks to us, or you have notified us in writing that all unused checks have been destroyed.

Following closing of your account, you agree to instruct us with respect to the disposition of property remaining in your account. If, after a reasonable period of time we have not received your instructions

regarding the disposition of the property remaining in your account, we may, but are not obligated to, mail a check to you at the last known address we have on record for you.

Your account will be closed after all the property remaining has been transferred from your account and the proceeds paid to you. You understand and agree that until your account is closed, we will charge any applicable fees to your account, as permitted by applicable law.

You understand and agree that closing an account or terminating or restricting services will not affect your obligations incurred in connection with the account, including the obligation to pay for checks or other charges. This Agreement will continue to govern matters relating to your account that arose before your account was closed or that may arise after the closing of your account.

In the event of your death, MSSB shall have no liability for following valid instructions previously received from you or received from your agent until MSSB has actual notice of your death. You agree that if this account is an individual account, upon notice of your death and prior to the appointment of an executor or administrator, we may, at our sole discretion, take any actions we deem necessary to protect MSSB or your estate.

## 5. Fees, Charges and Compensation Earned by MSSB

You agree to pay any account fees and other charges related to your account(s) with us, and authorize us to automatically debit such fees from your account. You agree to promptly pay any deficiency that might arise in your accounts. You also agree that we may apply and you will pay a finance charge on any debit balance in your cash account(s). You also authorize us to transfer excess funds between any of your accounts for any reason that does not conflict with applicable law. You understand and agree that we reserve the right to add or change account and service fees and charges at any time with prior written notice to you of the new fees.

## 6. Client Qualifications

By signing this Client Agreement, you represent that you are of the age of majority and are qualified to open account(s) with MSSB.

Unless you advise us in writing to the contrary, you also represent that neither you nor any member of your immediate family is an employee of any exchange, or of any corporation of which an exchange owns a majority of the capital stock, or a member of any exchange or of any corporation, firm or individual engaged in the business of dealing, either as a broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper. You understand that you may be required, and agree if so requested by us, to provide us with a letter of approval from the employer if either you or an immediate family member is so employed.

You further represent that neither you nor any other person who has an ownership interest in or authority over this account knowingly owns, operates or is associated with a business that uses, at least in part, the Internet to receive or send information that could be used in placing, receiving, or otherwise knowingly transmitting a bet or wager.

## 7. Losses Due to Extraordinary Events

You agree that we are not liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of

Original

LAL

Keep This For Your Records

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 3 of 6
NY CS 9180795 05/18

LENLALIA

ID:

5764-245

trading, interruptions of communications or data processing, war, terrorist acts, strikes, acts of God or other conditions beyond MSSB's control.

## 8. Cash Management Services

You understand and agree that if you intend to utilize check writing privileges, Online Bill Payment or Electronic Funds Transfer ("EFT") privileges offered in connection with your account, to the degree permitted by your account type, we are authorized to debit your account immediately whenever a check, electronic or paper draft or Online Bill Payment is presented for payment on your behalf, when an EFT transaction is effected, or when any fee or charge is due (collectively "Payments"). You agree to comply with all of your agreements in favor of Bank Lender pursuant to the terms of your LAL Agreement, including, without limitation, all agreements with respect to checking privileges associated with your LAL Line of Credit, each of which are deemed incorporated into this Agreement as fully as if restated herein Without limiting the generality of the foregoing, you agree to maintain availability under your LAL Line of Credit ("LAL Availability"), sufficient to pay for (i) checks written by you or any Authorized Check Signers, (ii) EFT transactions and Online Bill Payments made by you or any other individuals authorized by you to effect such transactions, and (iii) standard transaction fees.

You understand that your LAL Availability may fluctuate on an intra day basis and is dependent on factors, including, but not limited to, the time required to collect checks deposited in your account, the market value of securities pledged as collateral for your LAL Line of Credit, the timing and status of securities transactions, and the time required to confirm transactions and data between financial institutions. You further agree that MSSB may determine, and may adjust, your LAL Availability in its sole discretion, in consultation with Bank Lender.

You understand and agree, however, that if you have insufficient LAL Availability to cover Payments when they become due, we have no obligation to make such Payments. You also understand and agree that we have no obligation to make partial Payments.

You acknowledge and agree that if there are multiple account owners, any one account owner may give us instructions regarding these services (including the check writing privilege, Online Bill Payments or EFT transactions), and all account co-owners authorize us to comply with any such instructions. You acknowledge that any multiple signature designation by you in or on any checks, resolution, signature card or other account documentation is solely for your convenience and for your own internal control purposes and is not binding on us or any affiliate bank and you agree that neither we nor our processing bank assumes any responsibility in that regard.

If we receive inconsistent instructions from any account co-owners relating to the check writing privilege, Online Bill Payment or EFT transactions, or other transactions (including instructions regarding cancellation of service or stopping of Payment), we may, at our option, honor any one of the instructions, or decline to honor any inconsistent instructions.

You acknowledge and agree that we and/or Bank Lender reserve the right to decline any purchase or cancel your check writing, Online Bill Payment and EFT privileges at any time for any reason with or without notice to you. If we so decide, you understand and agree that you are responsible for any pending debits, which will be processed and deducted immediately from your account.

Subject to any limitations imposed by applicable law, and except as otherwise set forth in this Agreement or in other disclosures provided to you, you agree that neither MSSB, nor any affiliate bank will be liable for any loss you incur in connection with your account, the check writing privilege, Online Bill Payments, EFT transactions, or other LAL Facilitation Account feature unless we are negligent in fulfilling this Agreement. In no event will we or any affiliate bank be liable for consequential, special or indirect damages or losses unless applicable law requires otherwise. You also agree that liability regarding online services is further limited by the applicable online services terms and conditions. To the extent you utilize online services you acknowledge that you are bound by those terms and conditions.

You shall protect your checks, each PIN, Telephone Authorization Code, and other account access security codes ("Security Codes") from access by anyone not authorized by you to use them. You will be liable for all check and online transactions conducted by anyone to whom you have given access or who has obtained access even if not authorized by you up to applicable legal limits. You understand that you are responsible for reviewing your account statement promptly to discover and report unauthorized activity, including use of your checks. You must notify MSSB and Bank Lender immediately if you believe or have reason to believe that there has been unauthorized activity in your account or that your checks have been lost, stolen or may be used by an unauthorized person. We may require that you send written confirmation of the unauthorized activity (or any error) within ten days of oral notification to Morgan Stanley, Debit Card Operations, 1 New York Plaza, 40th Floor, New York, NY 10004. Unless limited by law, or as otherwise set forth in this Agreement or in other disclosures provided to you, you will be responsible for losses that arise from your failure to (a) safeguard your checks and Security Codes and (b) review your monthly statement for possible unauthorized activity and to report any unauthorized activity to MSSB and Bank Lender as provided herein.

You agree that any termination of your account will result in the cancellation of the check writing privilege, Online Bill Payment, EFT service and any direct deposit and direct payment processing. If your account is terminated, you will remain responsible for the payment of charges to your account, as well as all fees, any checks you write and any outstanding Online Bill Payments and EFT transactions, in each case whether arising before or after the termination of your account. If your account is terminated or the check writing privilege is cancelled, you agree to immediately cease using the checks and you will promptly destroy, or if requested by us, return all unused checks. You also agree to instruct all initiators of direct deposit and direct payment to immediately cease all activity.

## A. Check Deposits and Check Writing

You understand and agree that when you deposit a domestic check for credit to your account, we will place a hold on it and delay crediting such funds to your LAL Availability for up to 10 Business Days after the day the check is received. You agree that the hold time is at our discretion. Interest or dividends will be forfeited, however, if your check is returned. You understand and agree that, during the hold period, checks may not be written under the check writing privilege against the funds on hold, nor may such funds be withdrawn. You also agree that, in our discretion, funds represented by the check may be unavailable for settling of securities transactions during the hold period. You acknowledge that we are not obligated to accept cash deposits and may reject any such deposits presented by you.



Original

LENLALIA          LAL

ID:

Keep This For Your Records

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 4 of 6
NY CS 9180795 05/18
764-245

Your account includes check writing privileges that provide you with access to the LAL Availability under your LAL Line of Credit. You agree that we may provide check writing privileges through third parties that we may designate in our discretion, and that such check writing privileges will be subject to those third parties' rules and applicable U.S. state and federal laws.

You understand that canceled checks are not returned, but that your account statement will include information about each check submitted for payment. You agree to review your account statement closely and alert us promptly regarding errors.

You understand and agree that we may, at our discretion, permit you to allow an Authorized Check Signer to have check writing privileges on your account. If an Authorized Check Signer is permitted, you are responsible for all checks written by such Authorized Check Signer.

You agree that order requests for checks bearing more than one signature line will only be fulfilled by MSSB for accounts for entities meeting certain eligibility requirements. You understand that our processing bank processes most checks by automated means based on information encoded on the checks, and that neither MSSB nor our processing bank may physically examine all checks to determine if they are properly signed or completed. You agree that MSSB and our processing bank may rely on such a process and that it will be deemed an acceptable standard of care on the part of MSSB and our processing bank's part.

You agree that if you request that a payment be stopped on any check, we cannot guarantee that payment on any such check will in fact be stopped. You understand that, if you request that payment on a check be stopped, such stop payment is effective only for six months and that, after that six month period, you must renew your order to stop payment. You agree that after any order to stop payment ceases to be effective, we may process the check for which payment previously was ordered stopped. You further agree that we will not be liable in any way if your order to stop payment cannot be executed or otherwise completed.

You also agree that we may charge a fee for any request to stop payment on a check as well as other fees associated with the check writing privilege, such as check reorders, copies of cancelled checks, or checks returned for insufficient funds. You may request a schedule of fees by contacting your Financial Advisor.

You understand that you may order additional checks through our vendor or a vendor of your choice. You agree that all checks must conform to MSSB check specifications, and that we will not be responsible for check processing errors as a result of your use of improper checks that do not conform to MSSB's check specifications. You also agree that we have no obligation to pay for replacement checks. You also agree to write checks only in U.S. dollar amounts and you understand and agree that checks written in other currencies may be returned and subject to applicable fees.

You understand and agree that we may prohibit your use of checks at our sole discretion, including, without limitation, prohibiting you from using checks to directly or indirectly purchase certain types of securities. You also agree that we reserve the right to delay crediting your LAL Line of Credit with the amount of your check deposited until your check has been satisfied from the LAL Availability in your account.

### B. Electronic Fund Transfers

Your account may be eligible for a variety of EFTs that are subject to separate service agreements. These services may include our Online Bill Payment Service or our Funds Transfer Service ("FTS"). In each case, you must agree to the separate terms and conditions governing the particular service you use to initiate EFTs. In addition, you agree that your use of EFTs to receive or transfer funds to or from your account is subject to the separate EFT disclosures for the method of transfer utilized.  Please contact your Financial Advisor for further information about these services.

## 9. Multiple Party Accounts

You agree that if this is a multiple party account, each account owner agrees to be jointly and severally liable for said account and to pay on demand any debit balance or losses at any time due in this account. Any account owner has full power and authority to take any appropriate action with respect to the account, either individually or in your joint names. MSSB and its successors are authorized and directed to act upon instructions received from any of you and to accept payment and securities from any of you for the credit of your account. Notwithstanding the ability of each of you to control the account individually, you understand and agree that we may, at our sole option, require written instructions signed by all account owners when transactions, payments or transfers are requested. If we receive inconsistent instructions from any account owners regarding anything relating to the account, including but not limited to withdrawing monies,
you understand and agree that we may, at our sole discretion, honor any one of the instructions or decline to honor any inconsistent instructions. Any and all notices or communications sent to any of you shall be binding upon all account owners. You hereby declare this account to be a joint tenancy with rights of survivorship unless you instruct us to establish another form of multiple ownership.

Each account owner agrees to hold MSSB harmless from and indemnify MSSB against any losses, causes of action, damages and expenses arising from or as the result of MSSB following the instructions, or declining to follow the inconsistent instructions, of any account owner. MSSB, in its sole discretion, may at any time suspend all activity in the multiple party account pending instructions from a court of competent jurisdiction or require that instructions pertaining to the multiple party account or the property therein be in writing signed by all account owners. MSSB shall be entitled to recover from your account or from any account owner prior to distribution of the funds or property therein such costs as it may incur, including reasonable attorneys' fees, as the result of any dispute between or among the account owners or their representatives or heirs, relating to or arising from your account.

Each account owner agrees that, in the event of the death of any account owner, the survivor or survivors shall immediately give us written notice thereof, and we may, before or after receiving such notice, take such actions, require such papers, inheritance or estate tax waivers, retain such portion of the account and restrict transactions in the account
as we may deem advisable to protect us against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of either or any account owner who shall have died shall be liable and each survivor shall continue to be liable, jointly and severally, to us for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by us of written notice of the death of the decedent, or
incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

Original

LENLALIA          LAL

**Keep This For Your Records**

ID:

5764-245

## 10. Arbitration

This Agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

• All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

• Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

• The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

• The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.

• The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry.

• The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

• The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.

You agree that all claims or controversies, whether such claims or controversies arose prior, on or subsequent to the date hereof, between you and MSSB and/or any of its present or former officers, directors, or employees concerning or arising from (i) any account maintained by you with MSSB individually or jointly with others in any capacity; (ii) any transaction involving MSSB or any predecessor or successor firms by merger, acquisition or other business combination and you, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between you and us, any duty arising from the business of MSSB or otherwise, shall be determined by arbitration before, and only before, any self-regulatory organization or exchange of which MSSB is a member. You may elect which of these arbitration forums shall hear the matter by sending a registered letter or other written communication addressed to Morgan Stanley at 1633 Broadway, 26th Floor, New York, NY 10019, Attn: Legal and Compliance Division. If you fail to make such election before the expiration of five (5) days after receipt of a written request from MSSB to make such election, MSSB shall have the right to choose the forum.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any predispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the person is excluded from the class by the court.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

The statute of limitations applicable to any claim, whether brought in arbitration or in a court of competent jurisdiction shall be that which would be applied by the courts in the state in which you reside or if you do not reside in the United States, the statute of limitations shall be that which would be applied by the courts in the state where the MSSB office servicing your account is located.



# Morgan Stanley

LENLALIA           LAL

ID: ████

Keep This For Your Records

LIQUIDITY ACCESS LINE APPLICATION - INDIVIDUAL AS BORROWER
(05/2018)
Page 6 of 6
NY CS 9180795 05/18

████ 5764-245

# Morgan Stanley

# Liquidity Access Line Terms and Conditions

These terms and conditions (the **"Terms and Conditions"**) are incorporated by reference in and form a part of the Liquidity Access Line Application and Agreements (together with these Terms and Conditions, the **"LAL Agreement"**) made by and between the Person or Persons signing the Liquidity Access Line Application and Agreements as a borrower or co-borrower (together and individually, the **"Borrower"**) and Morgan Stanley Private Bank, National Association, a national banking association (together with its successors and assigns, as applicable, **"Bank"**). **Capitalized terms used herein and not otherwise defined herein shall have the meaning given to them in the LAL Agreement.**

## Definitions

**"ACH"** means the funds transfer system governed by the ACH Rules which provides for the interbank clearing of electronic entries for participating financial institutions.

**"ACH Rules"** means the Operating Rules and the Operating Guidelines published by NACHA - The Electronic Payments Association.

**"Advance"** means any Variable Rate Advance or Fixed Rate Advance.

**"Affiliate"** means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote twenty-five percent (25%) or more of the voting stock (or equivalent) of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock (or the equivalent thereof), by contract or otherwise.

**"Anti-Money Laundering Laws"** shall have the meaning set forth in Section 8(S).

**"Automatic ACH Payment"** shall have the meaning set forth in Section 3(C).

**"Automatic Internal Payment"** shall have the meaning set forth in Section 3(B).

**"Broker"** means Morgan Stanley Smith Barney LLC and, as applicable, its successors and assigns.

**"Brokerage Account"** means a securities brokerage account maintained with Broker.

**"Business Day"** means a day on which Bank is open for business.

**"Co-Borrower"** shall have the meaning set forth in Section 7(A).

**"Collateral"** shall have the meaning set forth in Section 11(A).

**"Collateral Account"** means individually and collectively, the Brokerage Account(s) listed in Part A, Section III of the Liquidity Access Line Application and Agreements and each other Brokerage Account of a Borrower or a Pledgor at Broker that is or may be pledged hereafter as collateral for Borrower's obligations under the LAL Agreement or under any other Loan Document, together with the successors to those identified accounts, irrespective of whether the successor account bears a different name or account number.

**"Committed Amount"** means one hundred thousand dollars ($100,000).

**"Covered Overdraft Transaction"** means an ACH payment or a draft by check.  A purchase of securities, a wire transfer, a transfer to another Morgan Stanley account, or a transaction initiated with a debit or ATM card is not a Covered Overdraft Transaction.

**"Disbursement Date"** means the date of any disbursement of proceeds under an Advance or issuance of any Letter of Credit.

**"Effective Date"** has the meaning provided in the Liquidity Access Line Application and Agreements.

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS

BORROWER NAME

LENLALTC

<span>■</span>5764-245

LAL NUMBER
LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 1 of 21

**Keep This For Your Records**

NY CS 9346538 09/18

**"FCPA"** shall have the meaning set forth in Section 8(U).

**"Financial Assets"** means all investment property, financial assets, securities, and security entitlements (as such terms are defined in the Uniform Commercial Code) now owned or hereafter acquired by a Borrower, and all property held now or in the future by Broker for or on behalf of a Borrower. Without limiting the generality of the foregoing, the term "securities" shall be used in its broadest sense, and shall include, without limitation, all common and preferred stocks, equity securities, debt securities, investment securities, mutual funds, money market funds, repurchase agreements, banker's acceptances, bonds (including, without limitation, Eurodollar bonds, "Yankee bonds," dollar-pay Canadian bonds and non-dollar denominated bonds), commercial paper, other evidences of corporate indebtedness, foreign currency contracts, obligations of the U.S. Treasury or U.S. agencies (including, without limitation, bills, notes and bonds), and negotiable or non-negotiable certificates of deposit; and the term "security entitlements" shall include, without limitation, all rights with respect to any securities as such term is used herein.

**"Fixed Rate Advance"** means an advance under the Liquidity Access Line made, or to be made, to a Borrower or on a Borrower's behalf that accrues periodic interest at a fixed rate for the Fixed Rate Period.

**"Fixed Rate Index"** means LIBOR, or such replacement index as Bank shall determine from time to time in accordance with the terms of these Terms and Conditions.

**"Fixed Rate Period"** means, with respect to a Fixed Rate Advance, the period of time for which the rate of interest applicable to such Fixed Rate Advance will remain constant, as requested by Borrower and agreed by Bank for the Fixed Rate Advance.

**"Immediate Family Member"** means the spouse/partner, parent, grandparent, sibling, child, step-child, or in-law of the Prominent Public Figure.

**"Interest Spread"** means the percentage rate that is shown in the notice provided by Bank to Borrower stating that Borrower's Liquidity Access Line has been approved or in any subsequent statements and/or notices sent by Bank or Broker to Borrower from time to time.

**"Known Close Associate"** means those individuals that are widely and publicly known to maintain a close relationship to the Prominent Public Figure and can include anyone in any capacity, such as distant relatives, advisors, employees, and business representatives/agents.

**"LAL Agreement"** shall have the meaning set forth in the introductory paragraph of these Terms and Conditions.

**"LAL Check"** means any check drawn by Borrower on the Liquidity Access Line that may be used to obtain a Variable Rate Advance.

**"LAL Facilitation Account"** means a limited-purpose Brokerage Account established at Broker and linked to the Borrower's Liquidity Access Line on or prior to the Effective Date for the sole purpose of facilitating administration of the Liquidity Access Line, including, without limitation, Advances and repayments thereunder.

**"LAL Facilitation Account Agreement"** means the Liquidity Access Line Facilitation Account Agreement by and between Borrower and Broker, as amended, supplemented or otherwise modified from time to time.

**"LAL Obligations"** means the total of all obligations, debts and liabilities of a Borrower to Bank, including, without limitation: (1) the outstanding principal balance of all Advances made hereunder; plus (2) all accrued but unpaid interest, Letter of Credit Fees, and any other fees, charges or amounts payable to Bank in connection with the Liquidity Access Line, any Letter of Credit or otherwise in connection with the Loan Documents; plus (3) the aggregate amount of all Letter of Credit Commitments, plus (4) any and all costs of collection, including attorneys' fees (as such attorneys' fees may be limited by Section 9(A) and/or 15(B) hereof), of Bank in connection with the enforcement of its rights under the LAL Agreement and under any other Loan Document; and with respect to each of clauses (1) through (4), whether such Borrower may be obligated as a guarantor, surety, or otherwise; whether recovery of such obligations may be or hereafter may become barred by any statute of limitations; and whether such obligations may be or hereafter may become otherwise unenforceable.

**"Letter of Credit"** shall have the meaning set forth in Section 6(A).

**"Letter of Credit Commitment"** means, at any time, the total undrawn amount of any Letters of Credit issued by Bank on behalf of Borrower pursuant to Section 6(A).

**"Letter of Credit Fee"** shall have the meaning set forth in Section 6(C).

**"LIBOR"** means, as of any date of determination: (i) for a Variable Rate Advance, the prevailing London Interbank Offered Rate, or any successor rate thereto, for deposits in U.S. dollars having a maturity of 30 days as quoted by the Bloomberg Service on such date or, if such rate is not available, the prevailing London Interbank Offered Rate for deposits in U.S. dollars having a maturity of 30 days as published in *The Wall Street Journal* on such date; and (ii) for a Fixed Rate Advance, the London Interbank Offered Rate/Swap Curve rate

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                                            ▉5764-245

BORROWER NAME                                        LAL NUMBER
                                                     LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                     (09/2018) LENLALTC
LENLALTC                    **Keep This For Your Records**                Page 2 of 21
                                                     NY CS 9346538 09/18

corresponding to the duration of the applicable Fixed Rate Period as quoted by the Bloomberg Service  two Business Days prior to the first day of such Fixed Rate Period, or if such rate is not available, the prevailing London Interbank Offered Rate/Swap Curve rate corresponding to the duration of the applicable  Fixed Rate Period as published in *The Wall Street Journal* two Business Days prior to the first day of such Fixed Rate Period; provided, however, that in each case Bank reserves the right to select a comparable replacement interest rate index if the rate otherwise used to determine LIBOR is not available, and provided further that in each case, if at any time LIBOR (or the replacement index, as applicable) is less than zero, then LIBOR (or the replacement index, as applicable) shall be deemed to be zero for purposes of this LAL Agreement.

**"Lien"** means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement having the effect of a lien or security interest whether created by law, contract, or otherwise.

**"Liquidity Access Line"** means the line of credit made available by Bank to Borrower pursuant to the terms of the LAL Agreement.

**"Loan Documents"** means the LAL Agreement, any Third Party Pledge Agreement, all financing statements with respect to the Collateral, and any other document or agreement entered into or delivered in connection with the Liquidity Access Line, in each case as amended, supplemented or otherwise modified from time to time.

**"Loan Party"** means a Borrower or Third Party Pledgor, and **"Loan Parties"** means all Borrowers and Third Party Pledgors.

**"Material Adverse Effect"** means in Bank's sole determination a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance, properties or prospects of a Loan Party, including the value of any Collateral, (b) the rights or remedies of Bank under a Loan Document, or (c) the ability of a Loan Party to perform any of its obligations under a Loan Document, including, without limitation, the repayment of all LAL Obligations.

**"Modification"** shall have the meaning set forth in Section 6(A).

**"Modify"** shall have the meaning set forth in Section 6(A).

**"Morgan Stanley"** means, collectively, Bank and Broker.

**"OFAC"** shall have the meaning set forth in Section 8(R).

**"Overdraft Service"** shall have the meaning set forth in Section 2(E)(1).

**"Party"** means Bank or a Borrower, and **"Parties"** means Bank and all Borrowers.

**"PEP Entity"** means any corporation, business or other entity that (1) has been formed by, or for the benefit of, a Prominent Public Figure; (2) has a key controller who is a Prominent Public Figure (e.g., the Prominent Public Figure exercises actual or effective control over the entity); or (3) has a Prominent Public Figure that is the ultimate beneficial owner.

**"Person"** means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

**"Pledgor"** means a Person who has pledged and granted a Lien on a Collateral Account or any other Collateral as security for the LAL Obligations hereunder.

**"Politically Exposed Person"** means a Prominent Public Figure, Immediate Family Member of a Prominent Public Figure, or a Known Close Associate of a Prominent Public Figure.

**"Prominent Public Figure"** means a natural person currently or formerly entrusted with a senior public role or function (e.g., a senior official in the executive, legislative, military, administrative, or judicial branches of government, whether elected or not) or a major political party, a senior executive of a government-owned corporation or a corporation, business or other entity formed by, or for the benefit of, such a figure.

**"Sanctioned Person"** shall have the meaning set forth in Section 8(R).

**"Sanctions"** shall have the meaning set forth in Section 8(R).

**"Scheduled Payment Date(s)"** means (i) with respect to Fixed Rate Advances, the date(s) requested by Borrower and agreed to by Bank for the Fixed Rate Advance which in any event will be a Business Day; and (ii) with respect to Variable Rate Advances, if Automatic ACH

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                      ▮▮▮5764-245

BORROWER NAME                                    LAL NUMBER
                                                 LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                 (09/2018) LENLALTC
LENLALTC                  **Keep This For Your Records**                Page 3 of 21
                                                 NY CS 9346538 09/18

Payment or Automatic Internal Payment has been established for Variable Rate Advances, the date(s) set forth in Borrower's periodic statement or if any such date is not a Business Day, the following Business Day.

**"State"** means any state in the United States or the District of Columbia.

**"Stated Event"** means the occurrence of any of the following events: (i) any Loan Party shall have failed to make any payment under the Loan Documents or to have provided any additional Collateral as required hereunder or under any other Loan Document when due or to have complied with or performed any other term, obligation, covenant or condition contained in the Loan Documents; (ii) Bank determines, in its sole discretion, that any representation or warranty made by any Loan Party or its agent in connection with the Liquidity Access Line or the Loan Documents was incorrect or misleading in any material respect when made or deemed made; (iii) (a) if any Loan Party is a natural Person, such Loan Party shall have died or been declared legally incompetent or (b) if any Loan Party is a legal entity, such Loan Party shall have dissolved, liquidated or terminated its operations; (iv) any Loan Party shall have become insolvent or generally not able to pay its debts as they become due, or shall have made an assignment for the benefit of creditors, or shall have become a debtor in any proceeding under bankruptcy, insolvency or other law providing relief to debtors; (v) any Collateral Account or any other Collateral shall have been attached, or become subject to a Lien or other encumbrance, or shall have been transferred or assigned except in accordance with these Terms and Conditions; (vi) any Loan Party shall have defaulted under any loan or other obligation for the payment of money if the effect of such default is to accelerate the payment of such obligation or to permit the party to whom such obligation is owed, to accelerate the payment of such obligation; (vii) any Loan Party shall have breached or defaulted under any agreement or understanding between such Loan Party and Bank or any Affiliate of Bank (including, without limitation, Broker); (viii) any final judgment or arbitration award shall have been entered against any Loan Party, or any Loan Party shall have entered into any settlement agreement with respect to any litigation or arbitration, each with respect to the payment of money due or owing by such Loan Party; (ix) Bank determines, in its sole discretion, that the consummation of any transaction contemplated by the Loan Documents could subject the Bank or any of its Affiliates to material franchise or reputational risk or (x) Bank determines, in its sole discretion, that any event has occurred which has resulted or may result in a Material Adverse Effect.

**"Subsidiary"** of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than fifty percent (50%) of: (a) the issued and outstanding voting stock of such corporation; (b) the interest in the capital or profits of such limited liability company, partnership or joint venture; or (c) the beneficial interest in such trust or estate, is, in each case, at the time directly or indirectly owned or controlled by (i) such Person, (ii) such Person and one or more of its other Subsidiaries or (iii) one or more of such Person's other Subsidiaries.

**"Third Party Collateral"** shall have the meaning set forth in Section 11(I).

**"Third Party Pledge Agreement"** means the agreement by which a Person (other than a Borrower) grants Bank a Lien on one or more Collateral Accounts as security for performance by the Loan Parties of their obligations under the Loan Documents, including repayment by Borrower of the LAL Obligations.

**"Third Party Pledgor"** means a Person who enters into a Third Party Pledge Agreement with Bank.

**"Total Advance Limit"** means the line of credit advance limit set by Bank when a Liquidity Access Line is activated, which may be adjusted from time to time in Bank's sole discretion (including, without limitation, based on the maximum lending value of the Collateral and Third Party Collateral (if any)) and that is used to determine the maximum amount of credit available to Borrower under the Liquidity Access Line, the Interest Spread and/or the Letter of Credit Fees on a Liquidity Access Line.

**"Uniform Commercial Code"** means the Uniform Commercial Code as enacted in the State of New York, as amended from time to time.

**"Variable Rate Advance"** means an advance under the Liquidity Access Line made, or to be made, to Borrower or on Borrower's behalf that accrues interest at a variable rate.

**"Variable Rate Index"** means LIBOR, or such replacement index as Bank shall determine from time to time in accordance with the terms of these Terms and Conditions.

## 1. Liquidity Access Line - General

A. Borrower acknowledges and agrees that, except as expressly provided in Section 1(E), Bank is not committed to make any Advance or issue any Letter of Credit hereunder, and may decline to make any such extension of credit in its sole discretion.

B. Borrower further acknowledges and agrees that, except as expressly provided in Section 1(E), the Liquidity Access Line is a demand line of credit and Bank may at any time, in its sole discretion and without cause, demand that Borrower immediately

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS                                                    ▮▮▮▮5764-245

BORROWER NAME                                                                  LAL NUMBER

LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC

LENLALTC                          **Keep This For Your Records**                          Page 4 of 21
NY CS 9346538 09/18

repay any and all outstanding LAL Obligations in whole or in part, whereupon Borrower shall be obligated to repay immediately all such LAL Obligations, even if no Stated Event has occurred.

C.   Borrower shall repay Bank, in accordance with the terms of the LAL Agreement, for all credit extended under the Liquidity Access Line and the LAL Agreement and all fees and other charges, including, without limitation: (1) the amount of all Variable Rate Advances, interest, fees and other charges relating to the Variable Rate Advances; (2) the amount of all Fixed Rate Advances, interest, fees and other charges relating to the Fixed Rate Advances; and (3) draws by a beneficiary under a Letter of Credit and any Letter of Credit Fees.

D.   **Bank may, at any time, amend, supplement or modify any term or provision of these Terms and Conditions, including, but not limited to, the Variable Rate Index, the Fixed Rate Index, the Interest Spread, Letter of Credit Fees and any fees or other charges payable in connection with any Advance or a Letter of Credit.  Bank will provide notice to Borrower of any such amendment, supplement, or modification to the extent required by applicable law. Without limiting the generality of the foregoing, Bank may, in its sole discretion, change at any time and from time to time (i) the Total Advance Limit, (ii) the  Committed Amount, (iii) the lending value of all or any portion of the Collateral for the purposes of determining the Total Advance Limit, and (iv) those portions of the LAL Obligations that are included for purposes of determining compliance with the Total Advance Limit.**

E.   If Borrower is an individual or common law trust, no Stated Event shall have occurred and be continuing, and such Advance would not cause the LAL Obligations to exceed the Total Advance Limit, Bank will: (1) extend credit to Borrower up to the Committed Amount at the request of such Borrower, and (2) provide such Borrower with at least thirty (30) days' advance notice before terminating the Committed Amount of the Liquidity Access Line or demanding repayment of any outstanding balance of the Liquidity Access Line, up to the Committed Amount.

## 2.   Advances

A.   Advances shall be requested and made pursuant to procedures and requirements established by Morgan Stanley from time to time. Each Advance shall be a Variable Rate Advance unless Borrower specifically requests a Fixed Rate Advance and Bank approves such request; provided that (1) the minimum amount of a Fixed Rate Advance shall be one hundred thousand dollars ($100,000) and (2) Borrower shall request a Fixed Rate Advance at least two (2) Business Days prior to the applicable Disbursement Date, in each case, unless otherwise agreed by Bank.

B.   **In addition to Bank's right to amend, supplement or modify any term of these Terms and Conditions, from time to time, Bank may provide notice to Borrower of the Total Advance Limit for the Liquidity Access Line . Bank may set the Total Advance Limit, and revise it from time to time, in its sole discretion. The Total Advance Limit is intended to provide Borrower with information about the aggregate amount of Advances or Letters of Credit that may be, or may be permitted to be, outstanding under the LAL Agreement at a particular time, but it is not an amount of credit that Bank has committed to provide Borrower.**

C.   Borrower may request that an Advance be disbursed by LAL Check, wire transfer or such other means as offered by Morgan Stanley from time to time. Borrower acknowledges that any amounts made available to Borrower by Morgan Stanley through the LAL Facilitation Account shall be deemed to be Advances made by Bank to Borrower under the Liquidity Access Line, and that all such amounts shall constitute outstanding LAL Obligations in accordance with the terms hereof.  For disbursements requested to be made by wire transfer, Borrower's request shall specify the deposit account to which proceeds of the Advance are to be sent or deposited.  Morgan Stanley may rely on account information provided by Borrower in a wire transfer or other request without investigation and Borrower bears the entire risk of wire or other transfers to the wrong account because of incorrect account information provided by Borrower. Interest shall begin to accrue on the amount of an Advance from the date Bank makes such Advance.

D.   **LAL Checks.**

(1)   Broker may provide Borrower with LAL Checks with which Borrower may request Variable Rate Advances by writing an LAL Check on the Liquidity Access Line. Borrower shall be deemed to have requested Bank to make a Variable Rate Advance in the amount of any LAL Check presented to Morgan Stanley through the check clearing processes, whether or not such LAL Check has been expressly authorized by Borrower. **Morgan Stanley shall not be responsible for any losses, damages or expenses incurred by Borrower from Morgan Stanley's decision to accept or decline any LAL Checks. Borrower shall not write an LAL Check that would cause the LAL Obligations to exceed the Total Advance Limit. Borrower shall not write, and Bank shall have no obligation to honor or issue payment on, an LAL Check after the Liquidity Access**

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                                           ▇▇5764-245

BORROWER NAME                                                                      LAL NUMBER

                                                                 LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                                                    (09/2018) LENLALTC
LENLALTC                          **Keep This For Your Records**                     Page 5 of 21
                                                                                    NY CS 9346538 09/18

**Line has been terminated in accordance with Section 13(A) hereof, and Borrower shall be liable for the full amount of each LAL Check paid by Morgan Stanley, regardless of when written.** Borrower shall notify Bank or Broker immediately if Borrower learns that any of Borrower's LAL Checks are lost or stolen.

(2)  Bank agrees to use reasonable efforts to stop payment on any LAL Check which Borrower instructs Bank or Broker not to pay if: (i) Bank or Broker receives Borrower's request in time to afford a reasonable opportunity to act on it, and (ii) Borrower otherwise complies with Bank's requirements for stop payment requests. Without limiting the foregoing, a stop payment request, which may be oral or written, must contain all of the following information: (i) the LAL Check number; (ii) the payee of the LAL Check; (iii) the date the LAL Check was written; (iv) the amount of the LAL Check; and (v) the account number. Morgan Stanley shall not be required to honor a stop payment request if the LAL Check was paid before Bank or Broker receives Borrower's instruction, or as provided under applicable law. Borrower will notify Bank or Broker immediately if an LAL Check on which Borrower has requested Bank or Broker to stop payment is recovered or if Borrower receives proof it was destroyed. Borrower shall notify Bank or Broker of any other reason a stop payment request should be cancelled.

E.  **Use of the Liquidity Access Line to Provide Overdraft Protection.**

(1)  Borrower may request that Bank make Variable Rate Advances to prevent a negative balance occurring in Borrower's Collateral Account arising out of Covered Overdraft Transactions (the "**Overdraft Service**").  If Borrower elects to participate in the Overdraft Service, the terms of this Section 2(E) apply.  Borrower may terminate his or her participation in the Overdraft Service at any time upon notice to Bank.

(2)  By electing to participate in the Overdraft Service, Borrower authorizes and directs Bank to make Variable Rate Advances when necessary to prevent a negative balance from arising in Borrower's Collateral Account at the end of any Business Day as a result of Covered Overdraft Transactions that in the aggregate exceed the amount of available cash in the Collateral Account.  Bank will not make Variable Rate Advances to pay for debits to Borrower's Collateral Account caused by purchases of securities, wire transfers, transfers to another Morgan Stanley account, or transactions initiated with a debit or ATM card. However, please note that the authorization of a transaction with a debit or ATM card may result in a "hold" on cash in the Collateral Account and reduce the amount of cash that is considered "available" in Borrower's Collateral Account.  The release of a hold on cash in Borrower's Collateral Account (for example, if a hold is created by using a card to reserve a hotel room and that reservation is then cancelled) will not affect any Variable Rate Advance previously extended; however, Borrower may use the funds that become available to make a payment on the Liquidity Access Line, as provided in these Terms and Conditions and the LAL Agreement.

(3)  Variable Rate Advances to pay overdrafts will incur interest as provided in Section 4(B) below.

(4)  Bank's agreement to make Variable Rate Advances in connection with the Overdraft Service is subject in its entirety to these Terms and Conditions and the LAL Agreement.  Without limiting the foregoing, Bank has no obligation to make a Variable Rate Advance under the Overdraft Service and may terminate the Overdraft Service or Borrower's participation in the Overdraft Service at any time.

**3.  Payments; Statements**

A.  **General.** Payments on the Liquidity Access Line shall be made pursuant to procedures and requirements established by Morgan Stanley from time to time.  Borrower acknowledges that any payments made to Morgan Stanley through the LAL Facilitation Account shall be deemed to be payments to Bank in respect of outstanding LAL Obligations in accordance with the terms hereof. Borrower shall not be entitled to subsequently reverse or rescind any payment in respect of LAL Obligations made through the LAL Facilitation Account and any such request shall be considered a request for a new Advance in accordance with the terms hereof. Other than Automatic ACH Payments or Automatic Internal Payments initiated by Bank that are designated for payment on a Fixed Rate Advance or prepayments on a Fixed Rate Advance (see Section 5(A)(4) for prepayment fees), all payments on the Liquidity Access Line shall be applied to Variable Rate Advances and any outstanding interest, fees and charges thereon. **Borrower acknowledges that if Bank receives a payment in excess of the balance of amounts owing with respect to all outstanding Variable Rate Advances, such excess shall be held as a suspense payment and as a credit balance for Variable Rate Advances until a new Variable Rate Advance is made (or such excess is refunded to the Borrower). Such excess payment shall not be applied to an outstanding Fixed Rate Advance until a Scheduled Payment Date for any such Fixed Rate Advance, unless Borrower directs Bank to apply such excess as a prepayment of an existing Fixed Rate Advance as provided in Section 5(A) (subject to Section 5(A)(4)). Until such direction from the Borrower is received by the Bank any such Fixed Rate Advance will continue to accrue interest in accordance with the terms of the LAL Agreement.** Except

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                                                 5764-245

BORROWER NAME                                                    LAL NUMBER
                                                                 LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                                 (09/2018) LENLALTC
LENLALTC                        **Keep This For Your Records**                   Page 6 of 21
                                                                 NY CS 9346538 09/18

as otherwise provided in the LAL Agreement, payments shall be applied first to interest due, second to outstanding principal and third to outstanding fees, costs and other charges.  Payments made before 4 p.m. Eastern time on any Business Day shall be deemed received by Bank on that Business Day for all purposes hereof (including, without limitation, for purposes of computing accrued and unpaid interest on outstanding LAL Obligations).

B.   All payments of principal, interest or other charges payable under the LAL Agreement must be in immediately available funds and in U.S. dollars. Borrower may pay amounts due each month by personal check drawn on a depository institution located in the United States, wire transfer, ACH credit initiated by Borrower, Automatic ACH Payment initiated by Bank or automatic internal transfer of funds initiated by Bank (**"Automatic Internal Payment"**). Borrower shall comply with Bank's payment instructions, including any instructions for effecting payments to Fixed Rate Advances.

C.   Borrower may authorize Morgan Stanley to initiate ACH debit entries (**"Automatic ACH Payment"**) or Automatic Internal Payments to pay amounts due each month from an account to be specified by Borrower in writing. After Morgan Stanley receives such authorization from Borrower in the form acceptable to Bank, the authorization shall remain in effect until Morgan Stanley receives from Borrower written notice in a form acceptable to Bank that such authorization is terminated, and both Morgan Stanley and the depository institution holding the account debited by the ACH or internal transfer have sufficient time to act on such notice.

D.   All payments required under the LAL Agreement must be made to Bank free and clear of any and all present and future taxes (including withholding taxes), levies, imposts, duties, deductions, fees, liabilities and similar charges except for taxes imposed by the United States on Bank's net income. If any such taxes or other charges are required to be withheld or deducted from any amount payable by Borrower under these Terms and Conditions, the amount payable will be increased to the amount which, after deduction from the increased amount of all taxes and other charges required to be withheld or deducted from the amount payable, will yield to Bank the amount stated to be payable under the LAL Agreement.

## 4.   Additional Terms Applicable to the Variable Rate Advances

A.   **Payments.**

(1)   **Demand.** Upon demand by Bank, Borrower agrees to pay the outstanding principal amount of each Variable Rate Advance, together with all accrued but unpaid interest and any other fees and charges payable in connection with such Variable Rate Advance. **Subject to the notice requirement as set forth in Section 1(E) hereof, Borrower acknowledges and agrees that Bank may demand payment of all or any portion of a Variable Rate Advance at any time.**

(2)   **Prepayments.** Borrower may, at any time, prepay all or any part of a Variable Rate Advance without premium or penalty. Borrower may establish Automatic ACH Payments or Automatic Internal Payments to pay Variable Rate Advances on Scheduled Payment Dates in accordance with requirements established by Morgan Stanley.

B.   **Interest.**

(1)   Each Variable Rate Advance will bear interest at a variable rate. The interest rate is set on the first Business Day of each week as the Variable Rate Index for the last Business Day in the immediately preceding week, plus the Interest Spread. **The interest rate on each Variable Rate Advance, including previously funded and outstanding Variable Rate Advances, will change if the Variable Rate Index changes or if the Interest Spread applicable to the Liquidity Access Line changes, which can occur if the Total Advance Limit changes.**

(2)   Interest shall begin to accrue from the date Bank makes the Variable Rate Advance and shall continue to accrue until the Variable Rate Advance is paid in full. Interest shall be computed on the basis of the number of days elapsed and a 360-day year. Interest shall accrue daily and shall be added to the outstanding principal amount of the Variable Rate Advance on the first Business Day of the following month, unless the Borrower makes a payment to Bank of such accrued interest.

(3)   Bank reserves the right to choose a new Variable Rate Index at any time. Each determination by Bank of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error. The Variable Rate Index will be determined by Bank in its sole discretion.

## 5.   Additional Terms  Applicable to Fixed Rate Advances

A.   **Payments.**

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                          ██████5764-245

BORROWER NAME                                                     LAL NUMBER

(1)  **General.** Borrower agrees to pay each Fixed Rate Advance by making the scheduled minimum payment (as described in Section 5(A)(3)) due on each Scheduled Payment Date. In the case of Fixed Rate Advances with Fixed Rate Periods of twelve (12) months or less, unless Borrower shall have made a payment or provided contrary instructions to Lender prior to the last day of the applicable Fixed Rate Period to make a Variable Rate Advance or to initiate an Automatic ACH Payment or Automatic Internal Payment transaction, on the last day of such Fixed Rate Period, Borrower shall be deemed to have requested that Bank make a Fixed Rate Advance of the same duration in an amount equal to the then outstanding principal amount, together with all accrued and unpaid interest on, and any other fees and charges in connection with such Fixed Rate Advance. The proceeds of such Fixed Rate Advance, Variable Rate Advance, Automatic ACH Payment or Automatic Internal Payment transaction, as applicable, will be applied directly to payment of the prior Fixed Rate Advance.  In the case of Fixed Rate Advances with Fixed Rate Periods of greater than twelve (12) months, on each Scheduled Payment Date, unless Borrower shall have made a payment, Bank will make a Variable Rate Advance, or if instructed by Borrower, initiate an Automatic ACH Payment or Automatic Internal Payment transaction, to pay such scheduled minimum payment.  The proceeds of such Variable Rate Advance, Automatic ACH Payment or Automatic Internal Payment transaction, as applicable, will be applied directly to payment of the Fixed Rate Advance.  If Borrower provides a payment to Bank to satisfy a scheduled minimum payment with respect to any Fixed Rate Advance, whether by check, wire transfer or ACH payment initiated by Borrower, such payment will be accomplished by making a Variable Rate Advance and applying the proceeds of such Variable Rate Advance to payment of the Fixed Rate Advance.  The payment received from Borrower will be applied to the Variable Rate Advance.

(2)  **Demand.** Upon demand by Bank, Borrower agrees to pay immediately the outstanding principal amount of each Fixed Rate Advance, together with all accrued but unpaid interest and any other fees and charges payable in connection with such Fixed Rate Advance. **Subject to the notice requirement in Section 1(E) hereof, Borrower acknowledges and agrees that Bank may demand payment of all or any portion of a Fixed Rate Advance at any time.**

(3)  **Scheduled Minimum Payments.** The scheduled minimum payment amount on a Fixed Rate Advance shall not change during the Fixed Rate Period. The scheduled minimum payment on a Fixed Rate Advance shall be either:

    (a) **Interest-Only Payments:** If Borrower has elected to make interest-only payments during the Fixed Rate Period, the scheduled minimum payment on each Scheduled Payment Date shall be an amount equal to the interest that accrues on the Fixed Rate Advance for the period beginning on the day of the immediately preceding Scheduled Payment Date (or for the first Scheduled Payment Date, the date interest begins to accrue on the Fixed Rate Advance) and ending on the day immediately preceding the next Scheduled Payment Date; or

    (b) **Amortization Payments:** In the case of Fixed Rate Advances with Fixed Rate Periods of greater than 12 months, Borrower may elect to make payments of interest and principal. If Borrower has elected to make payments of interest and principal during the Fixed Rate Period, the scheduled minimum payment on each Scheduled Payment Date shall be an amount equal to the sum of: (i) the interest that accrues on the Fixed Rate Advance for the period beginning on the date Bank makes such Fixed Rate Advance and subsequently on each anniversary date (based on the payment frequency Borrower selected in the request for such Fixed Rate Advance), and ending on the day immediately preceding the next anniversary date; plus (ii) a portion of principal. The scheduled minimum payment shall be calculated based on the amortization term Borrower selected  in the request for such Fixed Rate Advance.

(4)  **Prepayment Fee.** Borrower may, at any time, prepay all or any part of any Fixed Rate Advance.  Borrower shall pay Bank a prepayment fee if any portion of the principal on a Fixed Rate Advance is prepaid prior to the applicable Scheduled Payment Date(s), regardless of the reason that the Fixed Rate Advance is prepaid and including, without limitation, as a result of demand therefor by Bank. The prepayment fee payable by Borrower to Bank in such cases shall be an amount determined by Bank in its sole discretion. Upon request by Borrower, Bank shall provide details of the calculation of the prepayment fee payable by Borrower. Borrower authorizes Bank to effect payment of a prepayment fee by making a Variable Rate Advance in the amount of such prepayment fee, and applying the proceeds of such Variable Rate Advance to such prepayment fee. Any such Variable Rate Advance will bear interest at a variable rate as set forth in these Terms and Conditions for Variable Rate Advances, and such rate of interest may be higher or lower than the rate on the Fixed Rate Advance.

(5)  **Final Payment.** Borrower shall pay to Bank on the last day of the Fixed Rate Period for a Fixed Rate Advance an amount equal to the then outstanding principal amount, together with all accrued and unpaid interest on, and any other fees and charges in connection with, such Fixed Rate Advance. **Subject to Section 5(A)(1) above, if a Fixed Rate Advance is not paid in full when due, Borrower authorizes Bank to effect such payment by making a Variable Rate Advance in the amount of such outstanding payment due and applying the proceeds of such Variable Rate Advance to such payment.**

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                       ▬▬5764-245

BORROWER NAME                                             LAL NUMBER

                                                          LIQUIDITY ACCESS LINE TERMS AND CONDITIONS

                                                                 (09/2018) LENLALTC

LENLALTC                                  **Keep This For Your Records**                                Page 8 of 21

                                                                 NY CS 9346538 09/18

Such Variable Rate Advance will bear interest at the then applicable variable rate, as set forth in these Terms and Conditions, and such rate of interest may be higher or lower than the rate on the Fixed Rate Advance.

(6) **Borrower acknowledges that: (a) different interest rates may apply to Fixed Rate Advances and Variable Rate Advances and that prevailing interest rates fluctuate such that repayment of a Fixed Rate Advance with the proceeds of a Variable Rate Advance or new Fixed Rate Advance, as applicable, may increase the applicable interest rate owed by Borrower on any outstanding LAL Obligation ; (b) Bank may receive a payment which Borrower directs to be applied to a Fixed Rate Advance before, at the same time, or after the time that a Variable Rate Advance is made to effect a payment on the Fixed Rate Advance, and, in such case, such payment will be applied by Bank in accordance with Section 5(A)(1) hereof;  (c) interest will be charged on Variable Rate Advances and Fixed Rate Advances on the basis  of the balances of such Advances and actual credits to those Advances as described in these Terms and Conditions; and (d) Borrower may pay more interest as a result of the method of effecting payments to Fixed Rate Advances described in this Section 5(A) than Borrower would pay if payments were credited directly to Fixed Rate Advances.**

B. **Interest.**

(1) The interest rate on a Fixed Rate Advance will be the Fixed Rate Index for Fixed Rate Advances for the applicable Fixed Rate Period, plus the Interest Spread, plus an additional premium that may be added in Bank's discretion and communicated by Bank or Broker. The interest rate on a Fixed Rate Advance shall not change during the Fixed Rate Period.

(2) Interest shall begin to accrue from the date Bank makes the Fixed Rate Advance and shall continue to accrue until the Fixed Rate Advance is paid in full. Interest shall be computed on the basis of the number of days elapsed and a 360-day year. Interest shall accrue daily and will be paid by Borrower  on each Scheduled Payment Date in accordance with Section 5(A) (1).

## 6. Terms Applicable to Letters of Credit

A. **Issuance.** Bank may agree, as provided in this Section 6, to issue standby letters of credit (each, a **"Letter of Credit"**) and to renew, extend, increase, decrease or otherwise modify each Letter of Credit (**"Modify,"** and each such action a **"Modification"**), from time-to-time, upon the request of Borrower; provided, however, that (1) Borrower shall not request a Letter of Credit or Modification to a Letter of Credit if immediately after each such Letter of Credit is issued or Modified, the LAL Obligations would exceed the Total Advance Limit; and (2) Bank shall be entitled to approve or deny a request for the issuance of a Letter of Credit or Modification to a Letter of Credit in its sole discretion. **Each Letter of Credit shall be in an amount equal to at least one hundred thousand dollars ($100,000) and shall have an expiration date of twelve (12) months after issuance, unless otherwise agreed by Bank in writing on the face of the Letter of Credit.**

B. **Notice.** Borrower shall give Bank notice at least five (5) Business Days prior to the proposed date of issuance or Modification of each Letter of Credit, specifying the beneficiary, the proposed date of issuance (or Modification) and the expiration date of such Letter of Credit, and describing the proposed terms of such Letter of Credit and the nature of the transactions proposed to be supported thereby.

C. **Letter of Credit Fees.** Borrower shall pay to Bank with respect to each Letter of Credit, a letter of credit fee in the amount indicated in a notice provided by Bank to Borrower, such fee to be payable on the date the Letter of Credit is issued or upon any Modification of such Letter of Credit (**"Letter of Credit Fee"**). If Borrower or the beneficiary requests any changes to the form of Letter of Credit documentation presented by Bank, Bank shall be entitled to reject any such changes in its sole discretion and Borrower shall also pay Bank documentation and processing costs and expenses (including without limitation counsel fees) incurred by Bank in connection with the request, which shall be due and payable as incurred by Bank, whether or not the Letter of Credit is issued or the Modification is made. Borrower authorizes Bank to effect the payment of all Letter of Credit Fees and documentation and processing charges in connection with the issuance or Modification of Letters of Credit by making Variable Rate Advances in the amount of such fees and charges, and applying the proceeds of such Variable Rate Advances to the payment of such fees and charges, on the date that Borrower is required to pay such fees and charges or as otherwise determined by Bank.

D. **Reimbursement by Borrower.** Borrower shall be irrevocably and unconditionally obligated to reimburse Bank on demand for any amounts paid by Bank upon any drawing under any Letter of Credit, without presentment, demand, protest or other formalities of any kind. Unless Bank has agreed in writing to other payment terms for Borrower's reimbursement obligations for draws under a Letter of Credit, Borrower irrevocably authorizes Bank to effect the payment of Borrower's reimbursement

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                            ▮▮▮5764-245

BORROWER NAME                                              LAL NUMBER
                                              LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                              (09/2018) LENLALTC
LENLALTC                **Keep This For Your Records**              Page 9 of 21
                                              NY CS 9346538 09/18

obligation to Bank by making a Variable Rate Advance in the amount of the reimbursement obligation and applying the proceeds of such Variable Rate Advance to the payment of the reimbursement obligation.

E. **Obligations Absolute.** Borrower's reimbursement obligations under this Section 6 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which Borrower may have or have had against Bank or any beneficiary of a Letter of Credit. Borrower further agrees that Bank shall not be responsible for, and Borrower's reimbursement obligations in respect of any Letter of Credit shall not be affected by, among other things, (1) the validity or genuineness of documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, fraudulent or forged, (2) any dispute between or among Borrower, any of its Affiliates, the beneficiary of any Letter of Credit or any financial institution or other Person to whom any Letter of Credit may be transferred or (3) any claims or defenses whatsoever of Borrower or of any of its Affiliates against the beneficiary of any Letter of Credit or any such transferee. Bank shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit. Borrower agrees that any action taken or omitted by Bank under or in connection with a Letter of Credit and the related drafts and documents, if done without gross negligence or willful misconduct, shall be binding upon Borrower and shall not put Bank under any liability to Borrower.

F. **Actions of Bank.** Bank shall be entitled to rely, and shall be fully protected in relying, upon (1) any Letter of Credit, draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and (2) advice and statements of legal counsel, independent accountants and other experts selected by Bank.

G. **Termination of Account.** If the Liquidity Access Line is terminated for any reason and there is a Letter of Credit outstanding at the time of such termination, Bank may require Borrower to provide Bank with cash collateral in an amount equal to the Letter of Credit Commitment for all outstanding Letters of Credit as security for Borrower's performance of reimbursement and other obligations with respect to such outstanding Letters of Credit. If Borrower does not provide such cash collateral to Bank within five (5) Business Days after demand, Bank may direct Broker to liquidate any non-cash Collateral to establish such cash collateral. Bank agrees to release any unused portion of such cash collateral to Borrower upon expiration of such outstanding Letters of Credit and payment and satisfaction in full of Borrower's reimbursement and other obligations with respect to such outstanding Letters of Credit and other LAL Obligations then due.

## 7. Co-Borrowers

A. If more than one Person is applying as a Borrower (each Person, a **"Co-Borrower"**), each such Person confirms their intention to apply for joint credit by signing the Liquidity Access Line Application and Agreements as a Co-Borrower. The obligations and liabilities of each Co-Borrower hereunder and under each other Loan Document to which the Co-Borrowers are a party, shall be joint and several, regardless of any change in business relations, divorce, legal separation, or other legal proceedings or in any agreement that may affect liabilities between the Co-Borrowers. Each reference to "Borrower" hereunder shall be deemed to refer to each Borrower and any Co-Borrower individually and collectively.

B. The actions and instructions of any Borrower will be honored and shall be binding against each Borrower unless, in Bank's sole discretion, Bank elects to require joint action or instructions by all Borrowers. If Bank requests joint action or instructions by Borrowers and the Borrowers do not take the requested action or provide such instructions, Bank will not be required to honor the actions or instructions of any individual Borrower. To the maximum extent permitted by law, each Borrower waives any rights that require Bank, and Bank shall have no obligation, to provide to any Borrower any information concerning the performance of any other Borrower, or the ability of the other Borrower to perform the LAL Obligations or any other matter, regardless of what information Bank may from time to time have.

C. Bank shall have no responsibility to inquire into the use, apportionment, allocation or disposition of any Advance made to any Borrower. Bank may make any Advance, may amend, modify, extend, renew, restate, supplement or terminate in whole or in part the Loan Documents or any LAL Obligations or any Lien and may accept or release any Collateral at any time as permitted by the LAL Agreement or with the consent or agreement of any Borrower.

D. Each Borrower expects to derive benefit, directly or indirectly, from the credit extended by Bank hereunder. Each Borrower hereby waives any and all rights of subrogation, reimbursement, contribution, indemnity or otherwise arising by contract or operation of law, including without limitation any Lien rights, from or against any other Borrower until the Liquidity Access Line is paid in full and all of each Borrower's obligations under the Loan Documents including any outstanding LAL Obligations are fulfilled. Each Borrower acknowledges that the benefits received pursuant to the LAL Agreement constitute reasonably equivalent

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS

BORROWER NAME

5764-245

LAL NUMBER

LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 10 of 21
NY CS 9346538 09/18

LENLALTC                    **Keep This For Your Records**

value in exchange for the execution and delivery by such Borrower of the Loan Documents and the granting of all Liens in connection with the LAL Agreement. Each Borrower represents and warrants to Bank that (1) as of the date hereof and after giving effect to the execution and delivery of the LAL Agreement and all LAL Obligations and Liens, the sum of each Borrower's debts is less than all of such Borrower's assets at fair valuation, (2) after giving effect to this LAL Agreement, each Borrower is solvent and is then able and expects to be able to pay its debts as they mature or become due and (3) no Borrower is entering into the LAL Agreement or granting any Lien with actual intent to hinder, delay or defraud any creditor of such Borrower, whether such creditor now exists or may hereafter arise. Each Borrower waives any and all rights, defenses and benefits under any applicable law that limits the liability or exonerates guarantors or sureties.

E.    Each Borrower agrees that Bank may enforce any Loan Document against any Borrower or any Collateral, without first having sought enforcement of any Loan Documents against any other Borrower or Collateral. Each Borrower waives any defense to enforcement based on: (1) the bankruptcy, disability, dissolution, incompetence, insolvency, liquidation, or reorganization of any other Borrower; (2) any defense of any or all other Borrowers to payment or performance of any or all LAL Obligations or enforcement of any and all Liens; (3) the discharge, modification of the terms of, reduction in the amount of, or stay of enforcement of any or all Liens or any LAL Obligations in any bankruptcy, insolvency, reorganization, or other legal proceeding or by any other applicable law, ordinance, regulation, or rule (federal, state, or local); (4) the cessation of liability of any or all other Borrowers for any or all LAL Obligations; or (5) any claim or dispute by any other Borrower concerning the occurrence of a default, performance of any obligations, or any other matter.

## 8.    Representations and Warranties

Borrower understands and agrees that in granting the Liquidity Access Line, or making an Advance or issuing a Letter of Credit pursuant to the LAL Agreement, Bank is relying upon such Borrower's representations, warranties, and agreements as set forth in the Loan Documents. As of the Effective Date and as of each Disbursement Date, Borrower represents and warrants to Bank that:

A.    (1) if a natural Person, Borrower is at least 18 years of age and is of the age of majority in the State in which Borrower resides; (2) none of the Collateral is an asset of an employee benefit plan, as that term is defined by the Employee Retirement Income Security Act of 1974, or an Individual Retirement Account; and (3) unless a Loan Party advises Bank to the contrary, in writing, and provides Bank with a letter of approval, where required, from its employer, no Loan Party is an employee or member of any exchange or of any corporation or firm engaged in the business of dealing, either as a broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper;

B.    Borrower has not filed or recorded any documents or filings relating to assumed business names, and Borrower does not use any assumed business names;

C.    Borrower's execution, delivery, and performance of the LAL Agreement and all Loan Documents have been duly authorized by all necessary action by any necessary party, and do not conflict with, result in a violation of, or constitute a default under: (1) any provision of any other agreement or instrument binding upon Borrower or with respect to Borrower's assets including, without limitation, any securities trading policy applicable to Borrower or any of the Collateral, or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's assets;

D.    all financial information supplied by Borrower to Bank truly and completely disclosed Borrower's financial condition as of the date it was provided;

E.    to the best of Borrower's knowledge, all financial information with respect to Borrower supplied to Bank by any other party on behalf of Borrower truly and completely disclosed Borrower's financial condition as of the date it was provided;

F.    there has been no event or condition which has resulted or could result in a Material Adverse Effect subsequent to the date of the most recent financial information supplied to Bank;

G.    Borrower has no material contingent obligations except as disclosed in such financial information or otherwise disclosed to Bank in writing;

H.    the LAL Agreement constitutes, and any other Loan Document when delivered will constitute, legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms;

I.    except as previously disclosed in Borrower's financial statements or in writing to Bank in connection with the Liquidity Access Line and as accepted by Bank, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's Financial Assets free and clear of all Liens, and has not executed any security documents or financing statements relating to or otherwise encumbering any such assets;

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                                        ▊5764-245

BORROWER NAME                                                    LAL NUMBER
                                                                LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                                (09/2018) LENLALTC
LENLALTC                        **Keep This For Your Records**              Page 11 of 21
                                                                NY CS 9346538 09/18

J.   Borrower has not used, or filed, or authorized the use of or filing of, a financing statement under, any name other than the name in which Borrower obtained the Liquidity Access Line, for at least the last five (5) years;

K.   except as previously disclosed to Bank and approved by Bank in writing in connection with the Liquidity Access Line, no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower or any of Borrower's assets is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or assets;

L.   any tax returns or reports that are or were required to be filed by or on behalf of Borrower, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided;

M.   unless otherwise previously disclosed to and approved by Bank in writing in connection with the Liquidity Access Line, Borrower has not entered into or granted any security agreements, Liens or permitted the filing or attachment of any Liens on or affecting any of the Collateral directly or indirectly securing performance of Borrower's obligations under the Loan Documents;

N.   (i) Borrower has received and will receive reasonably equivalent value for its pledge of the Collateral, (ii) in pledging the Collateral, Borrower does not intend to defraud, hinder or delay any of its creditors and (iii) Borrower is currently, and after giving effect to any and each pledge of the Collateral will be, solvent.  As used in the preceding sentence, "solvent" means, with respect to any person, that at the time of determination:

(1)   the fair value of its assets, both at fair valuation and at present fair saleable value, is in excess of the total amount of its liabilities, including, without limitation, contingent claims; and

(2)   it is then able and expects to be able to pay its debts as they mature; and

(3)   it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

Contingent liabilities (such as litigation, guaranties, and pension plan liabilities) shall be computed at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability;

O.   all information contained in the LAL Agreement or submitted either by Borrower or on Borrower's behalf in connection with the Liquidity Access Line is true, accurate and complete;

P.   neither Borrower nor any other Person who has an ownership interest in or authority over any Collateral Account knowingly owns, operates or is associated with a business that uses, at least in part, the Internet to receive or send information that could be used in placing, receiving or otherwise knowingly transmitting a bet or wager;

Q.   the LAL Agreement and all Loan Documents are binding upon the Parties thereto, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms;

R.   Borrower has disclosed to Bank if Borrower, and, if not a natural person, Borrower's Affiliates and/or Subsidiaries, is a Person that is, or is owned or controlled by Persons that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, the United Nations Security Council, the Council of the European Union or Her Majesty's Treasury of the United Kingdom (collectively "**Sanctions**") or (ii) located, organized or resident in a country or territory that is the subject of comprehensive territorial OFAC Sanctions (together with Sanctions, a "**Sanctioned Person**") (currently including Crimea, Cuba, Iran, North Korea, Sudan and Syria);

S.   Borrower has disclosed to Bank if Borrower, and, if not a natural person, Borrower's Affiliates and/or Subsidiaries, or any Person who, to Borrower's knowledge, has or will have an interest in the transaction contemplated by the LAL Agreement or will participate, in any manner whatsoever, in receiving or utilizing the proceeds of any Advance or Letter of Credit, whether directly or indirectly, is or has been a PEP Entity, a Politically Exposed Person or an Immediate Family Member or Known Close Associate of a Politically Exposed Person, and has provided or will provide the necessary information required by law;

T.   No Collateral or any portion thereof is or will consist of funds, assets or other property or interests in property that may cause or result in a violation of Sanctions, or applicable anti-money laundering or anti-corruption laws, rules or regulations;

U.   Borrower and, if not a natural person, Borrower's Affiliates and/or Subsidiaries, have (a) conducted their businesses in

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS

<u>BORROWER NAME</u>                                                      5764-245

LENLALTC                               **Keep This For Your Records**

LAL NUMBER
LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 12 of 21
NY CS 9346538 09/18

compliance with applicable anti-corruption and anti-money laundering laws, rules and regulations, including, without limitation, as applicable, the USA PATRIOT Act of 2001 and the U.S. Foreign Corrupt Practices Act of 1977 (the **"FCPA"**), as amended; and (b) where required under applicable law, have instituted and maintain policies and procedures reasonably designed to promote and achieve compliance with such laws, rules and regulations and with the representations and warranties contained herein, including, but not limited to, maintaining a Know Your Customer program to identify and verify each of its customers in accordance with applicable laws, including the identification of beneficial ownership;

V. **BORROWER (1) HAS NO DEFENSES TO OR SETOFFS AGAINST ANY LAL OBLIGATIONS OR OTHER OBLIGATIONS OWING TO BANK OR ITS AFFILIATES (THE "OBLIGATIONS"), NOR CLAIMS AGAINST BANK OR ITS AFFILIATES FOR ANY MATTER WHATSOEVER, RELATED OR UNRELATED TO THE OBLIGATIONS, AND (2) RELEASES BANK AND ITS AFFILIATES FROM ALL CLAIMS, CAUSES OF ACTION, AND COSTS, IN LAW OR EQUITY, EXISTING AS OF THE EFFECTIVE DATE OR ANY DISBURSEMENT DATE, AS APPLICABLE, WHICH BORROWER HAS OR MAY HAVE BY REASON OF ANY MATTER OF ANY CONCEIVABLE KIND OR CHARACTER WHATSOEVER, RELATED OR UNRELATED TO THE OBLIGATIONS, INCLUDING THE SUBJECT MATTER OF THE LAL AGREEMENT;** and

W. Borrower either (1) is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940 (the **"1940 Act"**), as amended, and to the extent any exemption from the definition of "investment company" is being relied upon, it is pursuant to an exemption other than under Section 3(c)(1) or 3(c)(7) of the 1940 Act or (2) is an issuer that would be an investment company under the 1940 Act but for the exclusion provided in Section 3(c)(1) or 3(c)(7) of the 1940 Act, and therefore agrees that so long as the LAL Agreement remains in effect, Borrower will not open any Consulting Group Investment Advisory Account with Morgan Stanley Smith Barney LLC or any of its affiliates or enter into any investment advisory agreement or investment advisory relationship with Morgan Stanley Investment Management Inc. or any of its affiliates. Borrower is not subject to regulation under any federal or state statute or regulation which limits its ability to incur indebtedness.

## 9. Costs and Expenses; Indemnification

A. Borrower agrees to pay upon demand all of Bank's fees, costs and expenses, including Bank's reasonable attorneys' fees and Bank's legal expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of the LAL Agreement and the Loan Documents. Bank may hire or pay someone else to help enforce the LAL Agreement and the Loan Documents, and Borrower shall pay the costs and expenses of such enforcement. Fees, costs and expenses include Bank's reasonable attorneys' fees and legal expenses, whether or not of Bank's salaried employees and whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court. Attorneys' fees recoverable under this Section 9(A) shall not exceed the amount recoverable pursuant to applicable law. Borrower hereby authorizes Bank and its Affiliates at any time and from time-to-time, without notice to Borrower, and whether or not Bank shall have made any demand or a Stated Event has occurred, to charge any account of such Borrower maintained by Bank or any of its Affiliates against such fees, costs and expenses. At Bank's option, all such fees, costs and expenses incurred or paid by Bank for such purposes will become a part of Borrower's LAL Obligations and, at Bank's option, may be treated as a Variable Rate Advance. The rights of Bank and its Affiliates under this Section 9(A) are in addition to other rights and remedies (including, without limitation, rights of setoff) that Bank and its Affiliates may have.

B. Borrower agrees to indemnify and hold harmless Bank and each of its Affiliates and their respective officers, directors, employees, agents and advisors (each, an **"Indemnified Party"**) from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith): (1) the LAL Agreement or any other Loan Documents; (2) any of the transactions contemplated in the LAL Agreement, including any joint borrowing arrangement and the administration of the Liquidity Access Line through the LAL Facilitation Account; (3) the actual or proposed use of the proceeds of any Advance; (4) the issuance, execution or delivery of any Letter of Credit; (5) the actual or proposed use of any Letter of Credit; or (6) the payment or failure to pay under any Letter of Credit; except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS                                                                              ███5764-245

BORROWER NAME                                                                       LAL NUMBER

                                                                      LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                                                    (09/2018) LENLALTC
LENLALTC                          **Keep This For Your Records**                      Page 13 of 21
                                                                                    NY CS 9346538 09/18

C.  In the case of an investigation, litigation or other proceeding to which the indemnity in Section 9(B) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Borrower, its directors, equity holders or creditors or an Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

D.  **Borrower agrees not to assert any claim against Bank, any of Bank's Affiliates, Broker or any of their respective directors, officers, employees, attorneys and agents, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Liquidity Access Line , Loan Documents, an Advance or a Letter of Credit, any of the transactions contemplated in the Loan Documents (including, without limitation, the administration of the Liquidity Access Line through the LAL Facilitation Account) or the actual or proposed use of the proceeds of any Advance or Letter of Credit.**

E.  Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this Section 9 shall survive the payment in full of principal, interest and all other LAL Obligations payable under the LAL Agreement.

## 10.  Covenants of Borrower

Borrower agrees that, so long as the LAL Agreement remains in effect, Borrower will:

A.  Promptly inform Bank in writing of (1) all events or conditions which have resulted or could result in a Material Adverse Effect, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition or existence of Borrower;

B.  If Borrower is not a natural Person, (1) maintain its books and records in accordance with United States Generally Accepted Accounting Principles (**"GAAP"**) applied on a consistent basis, or in such other manner acceptable to Bank in its sole discretion, and (2) permit Bank to examine and audit Borrower's books and records at all reasonable times and upon reasonable notice;

C.  Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and Liens, of every kind and nature, imposed upon Borrower or Borrower's properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a Lien or charge upon any of Borrower's properties, income, or profits. For the avoidance of doubt, any withholding tax imposed on a payment made by Borrower with respect to the LAL Agreement or any other Loan Document is an obligation imposed upon Borrower;

D.  Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in the LAL Agreement, in the Loan Documents, and in all other instruments and agreements between Borrower and Bank;

E.  Notify Bank immediately in writing of any Stated Event or any material default in connection with a Loan Document, or any other instruments and agreements between Borrower and Bank;

F.  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use of the Collateral; provided, however, that Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Bank in writing prior to doing so and so long as, in Bank's sole discretion, Bank's interests in the Collateral are not jeopardized; and provided further that Bank may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Bank, to protect Bank's interest;

G.  Promptly upon request by Morgan Stanley, perform, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as Morgan Stanley may reasonably require from time-to-time in order to (1) carry out more effectively the purposes of the LAL Agreement and Loan Documents; (2) to the fullest extent permitted by applicable law, subject Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Loan Documents; (3) perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and any of the Liens intended to be created thereunder; and (4) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto Morgan Stanley the rights granted or now or hereafter intended to be granted to Bank under any Loan Document or under any other

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS

<span style="background:black">████</span>5764-245

BORROWER NAME

LAL NUMBER

LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 14 of 21

LENLALTC                                  **Keep This For Your Records**

NY CS 9346538 09/18

instrument executed in connection with any Loan Document to which Borrower(s) is or is to be a party (and Borrower hereby authorizes Morgan Stanley to do any of the foregoing at Morgan Stanley's sole discretion);

H.   Not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under a Loan Document;

I.   Not use any part of the proceeds of the Advance or Letter of Credit, directly or indirectly, by Borrower,  and, if not a natural person, any Affiliate and/or Subsidiary of Borrower, to fund, finance  or otherwise facilitate (i) any money laundering or terrorist financing activities or business; (ii) any activities or business in, with, on behalf of or otherwise involving any Sanctioned Person; (iii) any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage; or (iv) in any other manner that would result in a violation of Sanctions, or any applicable anti-money laundering or anti-corruption laws, rules or regulations;

J.   Notify Bank immediately in writing if there is any change to any information contained in the LAL Agreement or submitted either by Borrower or on Borrower's behalf in connection with the Liquidity Access Line; and

K.   Not allow any Advances or Letters of Credit under the Liquidity Access Line to be used: (1) to invest in industrial activity where the specified use of proceeds would significantly convert or degrade a critical habitat; (2) to knowingly finance extractive activities or commercial logging in World Heritage sites; (3) to finance companies or projects that collude with or are knowingly engaged in illegal logging; or (4) to knowingly finance projects that contravene international environmental agreements that have been enacted into the law of, or otherwise have the force of law in, the country in which the project is located.

## 11.   Collateral; Grant Of Security Interest

A.   To secure payment or performance by Borrower of all LAL Obligations, Borrower assigns, transfers and pledges to Bank, and grants Bank a first priority Lien on the following assets and rights of Borrower, wherever located and whether owned now or acquired or arising in the future: (1) the Collateral Account; (2) the LAL Facilitation Account; (3) any and all money, credit balances, certificated and uncertificated securities, security entitlements, commodity contracts, certificates of deposit, instruments, documents, partnership interests, general intangibles, Financial Assets and other investment property now or in the future credited to or carried, held or maintained in the Collateral Account or the LAL Facilitation Account; (4) any and all supporting obligations and other rights ancillary or attributable to, or arising in any way in connection with, any of the foregoing; and (5) any and all interest, dividends, distributions and other proceeds of any of the foregoing, including proceeds of proceeds  (collectively, **"Collateral"**). Upon the failure of Borrower to pay any LAL Obligation as and when due, Bank shall be entitled to exercise the rights of a secured party under this Agreement, any other Loan Document, the UCC and applicable law.

B.   Borrower shall take all actions to evidence, maintain and perfect Bank's first priority Lien on, and to enable Bank to obtain control over, the Collateral, including, but not limited to, making, executing, recording and delivering to Bank financing statements and amendments thereto, control agreements, notices, assignments, listings, powers, consents and other documents regarding the Collateral and Bank's Lien on the Collateral in a form as Bank reasonably may require. Collateral is not permitted to become subject to any lock-up agreement or other agreement that affects the Collateral during the term of these Terms and Conditions.  In respect to restricted and/or control stock, all appropriate Rule 144 paperwork will be kept up to date to include restricted and/or control stock held as Collateral, in the event that Bank liquidates and sells the Collateral, all Collateral consisting of securities will be readily transferable into "street name" in good deliverable form, and together with the securities of any other person whose sales must be aggregated under applicable laws and rules, will be saleable under the Securities Act of 1933 and other applicable laws and rules. Borrower irrevocably authorizes and appoints Bank as collateral agent, to act as Borrower's agent and attorney-in-fact to file any documents or to execute any documents in Borrower's name, with or without designation of authority.

C.   **Borrower agrees to maintain in the Collateral Account, at all times, Collateral having an aggregate lending value specified by Bank, determined from time -to- time in Bank's sole discretion,  as adequate to secure the full performance of the LAL Obligations.**

D.   Bank's sole duty for the custody, safe keeping and physical preservation of any Collateral in its possession will be to deal with the Collateral in the same manner as Bank deals with similar property for its own account. Borrower agrees that Bank will have no responsibility to act on any notice of corporate actions or events provided to holders of securities or other investment property included in the Collateral or to preserve rights in the Collateral against other parties. Borrower agrees to: (1) notify Bank promptly upon receipt of any communication to holders of the investment property disclosing or proposing any stock split, stock dividend, extraordinary cash dividend, spin-off or other corporate action or event as a result of which Borrower would receive securities,

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS                                              ███████5764-245

BORROWER NAME                                              LAL NUMBER

                                              LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                              (09/2018) LENLALTC
LENLALTC                    **Keep This For Your Records**                    Page 15 of 21
                                              NY CS 9346538 09/18

cash (other than ordinary cash dividends) or other assets in respect of the investment property; and (2) immediately upon receipt by Borrower of any of these assets, cause them to be credited to the Collateral Account or deliver them to or as directed by Bank as additional Collateral.

E.  Borrower agrees that all principal, interest, dividends, distributions, premiums or other income and other payments received by Bank or credited to the Collateral Account in respect of any Collateral may be held by Bank as additional Collateral or applied by Bank to the Liquidity Access Line. Bank may, at any time and at its option, transfer any securities or other investment property constituting Collateral to a securities account maintained in its name but for the benefit of Borrower or cause any Collateral Account to be redesignated or renamed in the name of Bank for the benefit of Borrower or take any other action with respect to the Collateral as it deems reasonably necessary to maintain or perfect such Lien.

F.  In addition to Bank's Lien, Bank will at all times have a right to set off against payments due under the LAL Agreement at or after the time at which they become due, whether upon demand, upon the occurrence of a Stated Event, at the end of a stated Fixed Rate Period, by acceleration or otherwise, all deposits or property at any time in any account maintained with Bank or any of its Affiliates by or for the benefit of Borrower, whether carried individually or jointly with others. Bank also shall have the option to administratively freeze any such accounts to allow Bank to protect Bank's charge and setoff rights. Bank's rights under this Section are in addition to, and not in limitation of, any rights Bank may have at law or otherwise.

G.  **Bank reserves the right, in its sole discretion, to: (1) disapprove any Collateral and to change the lending value of any Collateral; (2) require Borrower at any time to deposit into the Collateral Account additional Collateral in the amount Bank determines is appropriate to ensure compliance with the provisions of Section 11(C); and (3) require Borrower at any time to substitute new or additional Collateral for any Collateral that has previously been deposited in the Collateral Account.**

H.  Subject to Section 1(E) hereof and without limiting any other rights of the Bank under any of the Loan Documents, Bank reserves the right at any time to deny a request for an Advance or Letter of Credit for any reason including if Bank determines the value of the Collateral is not adequate.

I.  If a Third Party Pledgor has pledged collateral for the LAL Obligations pursuant to a Third Party Pledge Agreement ("Third Party Collateral"), Bank shall have the same rights with respect to such Third Party Collateral and the Liquidity Access Line as Bank has under Sections 11(C), 11(G) and 11(H) or otherwise under the LAL Agreement, and Borrower shall cause such Third Party Pledgor to comply with any requirements imposed under the LAL Agreement with respect to the Third Party Collateral.

## 12. Control

For the purpose of giving Bank control over the Collateral Account and in order to perfect Bank's Lien on the Collateral, Borrower consents to compliance by Broker with entitlement orders and instructions from Bank (or from any assignee or successor of Bank) regarding the Collateral Account without the further consent of Borrower. Without limiting the foregoing, Borrower acknowledges, consents and agrees that, pursuant to a control agreement entered into between Bank and Broker:

A.  In order to enable Borrower to trade Financial Assets that are from time-to-time credited to the Collateral Account, Broker may comply with entitlement orders originated by Borrower (or if so agreed by Bank, by an investment adviser designated by Borrower and acceptable to Bank and Broker) regarding the Collateral Account, but only until the time that Bank notifies Broker that Bank is asserting exclusive control over the Collateral Account. After Broker has received a notice of exclusive control and has had a reasonable opportunity to comply, it will no longer comply with entitlement orders originated by Borrower (or by any investment adviser designated by Borrower) concerning the Collateral Account.

B.  The Parties acknowledge that Broker is an intended third party beneficiary of this Section 12 and shall be entitled to rely on it to such degree and with the same force and effect as if Broker were a party to the LAL Agreement.

## 13. Termination

A.  **Except as expressly provided in Section 1(E), Bank may at any time, at its option and in its sole discretion, terminate the Liquidity Access Line by providing notice to Borrower in accordance with the LAL Agreement; provided, however, that Bank may take any such action immediately and without notice to Borrower upon the occurrence of a Stated Event. Unless otherwise agreed in writing by Bank, the termination of the Liquidity Access Line shall constitute a declaration by Bank that any and all LAL Obligations then outstanding are due and payable, in which case any and all LAL Obligations outstanding shall become immediately due and payable regardless of any payment schedule otherwise applicable.**

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                                             ■■■5764-245

BORROWER NAME                                                      LAL NUMBER

                                                      LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                                        (09/2018) LENLALTC
LENLALTC                          **Keep This For Your Records**               Page 16 of 21
                                                                        NY CS 9346538 09/18

B.  Bank shall have all the rights and remedies provided in the Loan Documents, or available at law, in equity, or otherwise to enforce a Loan Party's obligations to Bank and Bank's rights with respect to the Collateral. All of Bank's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Bank to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower shall not affect Bank's right to exercise any of its rights and remedies. No failure on the part of Bank to exercise, and no delay in exercising, any rights or remedies hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such rights and remedies preclude any other or further exercise thereof or the exercise of any other rights and remedies. Any declaration by Bank that the LAL Obligations are due and payable by Borrower shall constitute a demand for payment by Bank.

## 14.  Limitation of Liability

**None of Bank, Broker, Bank's other affiliates or their respective directors, officers, employees, attorneys and agents will be liable to any Person for any special, indirect, consequential or punitive damages arising out of any act or omission by any of them with respect to a Loan Document, the Liquidity Access Line, an Advance or Letter of Credit, or the Collateral Account.**

## 15.  Dispute Resolution

A.  **ARBITRATION PROVISION. PLEASE READ THIS ARBITRATION PROVISION CAREFULLY. BORROWER AGREES THAT ANY PAST, PRESENT OR FUTURE LEGAL DISPUTE OR CLAIM OF ANY KIND, INCLUDING STATUTORY AND COMMON LAW CLAIMS AND CLAIMS FOR EQUITABLE RELIEF, THAT RELATES IN ANY WAY TO THE LIQUIDITY ACCESS LINE OR BORROWER'S RELATIONSHIP WITH BANK WILL BE RESOLVED BY BINDING ARBITRATION IF BORROWER OR BANK ELECTS TO ARBITRATE.**

**Right to Reject Arbitration: Borrower may reject this arbitration provision, in which event neither Borrower nor Bank will have the right to require arbitration.** Rejection will not affect any other aspect of the LAL Agreement. To reject the arbitration provision, Borrower must send Bank a notice within 60 days after the Liquidity Access Line is opened. The notice must include Borrower's name, address, and account number and be mailed to: Morgan Stanley Private Bank, National Association, One Utah Center, 201 S Main St, 5th Floor, Salt Lake City, Utah 84111, Attention: Liquidity Access Line Administration. This is the only method Borrower can use to reject the arbitration **provision.**

As used in this Section 15 "Bank" means Bank and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, employees, officers and directors.

This arbitration provision covers all claims, except that Bank will not elect to arbitrate an individual claim brought by Borrower in small claims court or its equivalent if the claim does not exceed five thousand dollars ($5,000), unless that Claim is transferred, removed, or appealed to a different court.

The following describes the arbitration procedure, and its implications:

–  Notice: If Borrower or Bank elects to arbitrate, the other Party must be notified. Borrower must send notice to Bank at the following address: Morgan Stanley Private Bank, National Association, One Utah Center, 201 S Main St, 5th Floor, Salt Lake City, Utah 84111, Attention: Liquidity Access Line Administration. Notice can be given after a lawsuit has been filed, in which case it can be made in papers in the lawsuit.

–  Administrator: The person who starts the arbitration proceeding must choose an administrator, which can be either the National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405, www.arb-forum.com, (800) 474-2371; or the American Arbitration Association, 335 Madison Avenue, New York NY 10017, www.adr.org, (800) 778-7879. The actual arbitrator will be selected under the administrator's rules, and must be a lawyer with at least ten years of experience.

–  Applicable Law: These terms involve interstate commerce and this arbitration provision is governed by the Federal Arbitration Act, 9 U.S.C. §§1 et seq. (the **"FAA"**). New York law shall apply to the extent state law is relevant under Section 2 of the FAA in determining the validity of this provision. The arbitrator has to follow: (1) the substantive law, consistent with the FAA, that would apply if the matter had been brought in court; (2) this arbitration provision; and (3) the administrator's rules. The arbitrator is authorized to award remedies that would apply if the individual action were in a court (including, without limitation, punitive damages, which shall be governed by the constitutional standards employed by the U.S. Supreme Court).

–  Location/Fees: The arbitration will take place in a location reasonably convenient to Borrower. If Borrower asks Bank, Bank will pay all filing, administrative, hearing and/or other fees the administrator or arbitrator charges up to $2,500. If the cost is higher, Borrower can

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS                                                      ▮5764-245

BORROWER NAME                                                                                              LAL NUMBER

LENLALTC                                    **Keep This For Your Records**            LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 17 of 21
NY CS 9346538 09/18

ask Bank to pay more and Bank will consider the request in good faith but shall have no obligation to pay such additional amount unless Bank is required to pay such additional amount under applicable law.

– Judgment/Appeals. A court may enter judgment upon the arbitrator's award. The arbitrator's decision will be final and binding except for: (1) any appeal right under the FAA; and (2) any Party may appeal decisions relating to claims of more than $100,000 to a three-arbitrator panel appointed by the administrator, which will reconsider all over again any aspect of the appealed award. If Borrower appeals, Bank will consider in good faith a request that Bank pay any additional fees of the administrator or arbitrator.

**IMPORTANT LIMITATIONS AND RESTRICTIONS: If a claim goes to arbitration, neither BORROWER NOR BANK will have the right to: (1) have a court or a jury decide the claim; (2) engage in discovery (i.e., the right to obtain information from the other party) to the same extent that THE PARTY could in court; (3) participate in a class action in court or in arbitration, either as a class representative or a class member; (4) act as a private attorney general in court or in arbitration; or (5) join or consolidate  claim(s) with claims of any other person. The right to appeal is more limited in arbitration than in court. Other rights that THE PARTY would have if THE PARTY went to court may also not be available in arbitration. Only a court may determine the validity and effect of parts 3, 4 and 5 of this paragraph. If a court should hold such part(s) to be invalid, then the entire provision shall be null and void, notwithstanding the provisions of Section 16(G). However, this will not limit the right to appeal such holding. IF A COURT SHOULD HOLD ANY OTHER PART(S) OF THIS ARBITRATION PROVISION TO BE INVALID, THE REMAINING PARTS SHALL BE ENFORCEABLE.**

This arbitration provision will survive the termination of the Liquidity Access Line and will remain in force no matter what happens to Borrower or the Liquidity Access Line. If the administrator's rules conflict with the rules described in this provision, this provision will apply.

B. **Bank's Expenditures.** If any action or proceeding is commenced that would materially affect Bank's interest in the Collateral or if a Loan Party fails to comply with any provision of a Loan Document, Bank may (but shall not be obligated to) take any action that Bank deems appropriate, including but not limited to discharging or paying all taxes, Liens, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. Any attorneys' fees recoverable under this Section 15(B) shall not exceed the amount recoverable pursuant to applicable law. All such expenditures incurred or paid by Bank for such purposes will become a part of Borrower's LAL Obligations and, at Bank's option will be treated as a Variable Rate Advance.

C. Nothing in this Section 15 will be deemed to alter any agreement to arbitrate any controversies that may arise between Borrower and Broker, and any claims between Borrower and Broker will be arbitrated as provided in any agreement between Borrower and Broker.

## 16. Miscellaneous

A. **Notices.** Unless otherwise provided by applicable law or under these Terms and Conditions, any notice required to be given under the LAL Agreement or required by law shall be given in writing, and shall be effective when Bank provides the notice to the United States Postal Service or a commercial delivery service for delivery to Borrower; provided, however, that if the Bank notifies any Loan Party of (i) a demand for payment or (ii) a default of such Loan Party's obligations under the LAL Agreement with respect to the Collateral, such notice may be made orally or electronically,  including, without limitation, telephonically or via facsimile or electronic mail.  All notices sent via facsimile or electronic mail will be effective upon the faxing or sending thereof. Notices to Borrower(s) shall be sent to the address of Borrower shown on the records of Bank, as such records may be updated from time to time in accordance with standard Morgan Stanley procedures, including, without limitation, as a result of updates to Borrower's LAL Facilitation Account profile.  Notices to Bank shall be sent to the address in Section 15 or such other address identified by Bank from time to time.

B. **No Waiver by Bank.** Bank shall not be deemed to have waived any rights under the LAL Agreement unless such waiver is given in writing and signed by Bank. No delay or omission on the part of Bank in exercising any right shall operate as a waiver of such right or any other right. A waiver by Bank of a provision of the LAL Agreement shall not prejudice or constitute a waiver of Bank's right otherwise to demand strict compliance with that provision or any other provision of the LAL Agreement. No prior waiver by Bank, nor any course of dealing between Bank and any Borrower shall constitute a waiver of any of Bank's rights or of any of Borrower's obligations as to any future transactions. Whenever the consent of Bank is required under the LAL Agreement, the granting of such consent by Bank in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Bank.

C. **Assignment.**

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS                                    ███████5764-245

BORROWER NAME                                                LAL NUMBER
                                                             LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
                                                             (09/2018) LENLALTC
LENLALTC                     **Keep This For Your Records**  Page 18 of 21
                                                             NY CS 9346538 09/18

(1) **Binding Effect; Assignment.** The LAL Agreement shall become effective on the Effective Date and thereafter shall be binding upon and inure to the benefit of each Borrower, Bank and their respective successors and permitted assigns; provided that Borrower(s) shall not have the right to assign its rights under the LAL Agreement or any interest herein without the prior written consent of Bank.

(2) **Assignments and Participations.** Bank may assign to one or more Persons all or a portion of its rights and obligations under the LAL Agreement (including, without limitation, all or a portion of the Liquidity Access Line, Advances owing to Bank, or rights and obligations under any Letter of Credit), without notice to, or the consent of any Borrower. Bank may sell participations to one or more Persons (other than a Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under the LAL Agreement (including, without limitation, all or a portion of its Liquidity Access Line, Advances owing to Bank, or rights and obligations under any Letter of Credit). Bank may (and Borrower hereby agrees that) in connection with any assignment or participation or proposed assignment or participation pursuant to this Section, disclose to the assignee or participant or proposed assignee or participant, any information relating to a Loan Party furnished to Bank by or on behalf of a Loan Party.

D. **Governing Law.** The LAL Agreement will be governed by, construed and enforced in accordance with federal law and, to the extent state law applies, the laws of the State of New York, without reference to the choice of law provisions of New York law. For purposes of the LAL Agreement, the jurisdiction of the Broker shall be the State of New York.

E. **Counterparts.** The LAL Agreement may be executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of the LAL Agreement by fax shall be effective as delivery of an original executed counterpart of the LAL Agreement.

F. **Interest Rate Limitation.** Notwithstanding any provision of the LAL Agreement to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the **"Charges"**), as provided for in a Loan Document, or otherwise contracted for, charged, received, taken or reserved by Bank, shall exceed the maximum legal rate (the **"Maximum Legal Rate"**) that may be contracted for, charged, taken, received or reserved by Bank in accordance with applicable law, the rate of interest payable to Bank, together with all Charges payable to Bank, shall be limited to the Maximum Legal Rate. No Borrower or any other Person who is or will become liable for payment of the obligations of a Borrower under the Loan Documents shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully charged under applicable law from time-to-time in effect, and the provisions of this Section shall control over all other provisions of the Loan Documents that may be in conflict. If (1) the maturity of the obligations of any Borrower under the Loan Documents is accelerated for any reason; (2) any of such obligations are prepaid and as a result any amounts held to constitute interest are determined to be in excess of the legal maximum; or (3) Bank or any other holder of any or all of the obligations of Borrower under the Loan Documents shall otherwise collect moneys that are determined to constitute interest that would otherwise increase the interest on any or all of such obligations to an amount in excess of that permitted to be charged by applicable law then in effect, then all such sums determined to constitute interest in excess of such legal limit shall, without penalty, be promptly applied to reduce the then outstanding principal of such obligations or, at Bank's or such holder's option, promptly returned to such Borrower or the other payor thereof upon such determination.

G. **Severability.** If a court of competent jurisdiction finds any provision of the LAL Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from the LAL Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of the LAL Agreement shall not affect the legality, validity or enforceability of any other provision of the LAL Agreement.

H. **Interpretation.** Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in the LAL Agreement shall have the meanings attributed to such terms in the applicable Uniform Commercial Code. Accounting words and terms not otherwise defined in the LAL Agreement shall have the meanings assigned to them in accordance with GAAP in effect on the Effective Date.

I. **Headings.** Section headings in the LAL Agreement are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose.

---

**For Morgan Stanley Private Bank, National Association Use Only**

MAXMILIANO FRANCO PILIPIS                                                                                 ████5764-245

BORROWER NAME                                                                 LAL NUMBER

J.  **Bank Action.** Bank shall have the right, but not the obligation, to take any action at any Borrower's expense if Bank believes, in its sole discretion after consultation with such Borrower, that such action is necessary to avoid the occurrence of a Material Adverse Effect.

K.  **SCRA.** If you are on active duty in the military service of the United States of America, Bank acknowledges that the exercise of certain of its rights and remedies under the Loan Documents may be limited by applicable provisions of the Servicemember Civil Relief Act.

L.  **Survival.**

(1)  All covenants, agreements, representations and warranties made by a Loan Party in a Loan Document, and in the certificates or other instruments delivered in connection with or pursuant to a Loan Document shall be considered to have been relied upon by Bank and shall survive the execution and delivery of the Loan Documents and the making of any Advance and issuance of any Letter of Credit, regardless of any investigation made by Bank or on its behalf and notwithstanding that Bank may have had notice or knowledge of any Stated Event or incorrect representation or warranty at the time any credit is extended under the LAL Agreement, and shall continue in full force and effect until the Liquidity Access Line is terminated and any LAL Obligations are paid and performed in full.

(2)  Termination of the Liquidity Access Line shall not affect Borrower's obligations (and Bank's rights) with respect to any LAL Obligations outstanding at the time of termination; provided that Borrower's reimbursement obligations with respect to any Letter of Credit Commitments at the time of termination of the Liquidity Access Line shall (for purposes of this sentence) be deemed to be LAL Obligations of Borrower as of such termination even if the draws under a Letter of Credit that give rise to such reimbursement obligations occur after such termination. The provisions of Sections 6(G), 9, 11, 14, 15 and 16 shall survive and remain in full force and effect regardless of payment and performance in full of all obligations of the Loan Parties under the Loan Documents.

M.  **Additional Loans.** Other than the Liquidity Access Line, up to the Committed Amount, Bank has not committed, and nothing herein shall be construed as a commitment on behalf of Bank, to extend any loans, credit or other financial accommodations and Bank's granting, renewing, or extending of any other loan, credit or other financial accommodations at all times shall be subject to Bank's sole discretion.

N.  **Taxes.** Borrower(s) shall pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder, from the issuance of a Letter of Credit hereunder, or from the execution, delivery or registration of, performing under, or otherwise with respect to, the LAL Agreement or any other Loan Document.

O.  **Evidence of Debt.** Bank shall maintain in accordance with its usual practice an account or accounts evidencing the LAL Obligations of Borrower to Bank under the Liquidity Access Line, including the amounts of principal and interest payable and paid to Bank from time-to-time under the LAL Agreement. Entries made in good faith by Bank in such account or accounts shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from a Borrower to Bank under the LAL Agreement, absent manifest error; provided, however, that the failure of Bank to make an entry, or any finding that an entry is incorrect, in such account or accounts shall not limit or otherwise affect the obligations of a Borrower under the LAL Agreement.

P.  **Final Agreement.** The Loan Documents constitute the entire understanding and agreement of the Loan Parties as to the matters set forth in the Loan Documents, are the final expression of the agreement between Bank and each Loan Party and may not be contradicted by evidence of any alleged oral agreement.

## 17. State Specific Provisions

A.  For residents of Georgia:

With regard to sections 9(A) and 15(B), attorney's fees shall be limited to 15% of the outstanding principal balance of all Advances made hereunder and all accrued and unpaid interest thereon.

B.  For residents of Iowa:

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THE LAL AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT**

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS

BORROWER NAME

█████5764-245

LAL NUMBER

LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 20 of 21
NY CS 9346538 09/18

LENLALTC          **Keep This For Your Records**

**CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THE LAL AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

C.   For residents of Missouri:

**Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and Bank (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.**

D.   For residents of New Hampshire:

With regard to sections 9(A) and 15(B), reasonable attorney's fees shall be awarded to Borrower if Borrower prevails in: (a) any action, suit or proceeding brought by Bank; or (b) an action brought by Borrower. If Borrower successfully asserts a partial defense or set-off, recoupment or counterclaim to an action brought by Bank, the court may withhold from Bank the entire amount or such portion of the attorney fees as the court considers equitable.

E.   For residents of Ohio:

The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

F.   For residents of Vermont:

**NOTICE TO BORROWER: THIS IS A DEMAND FACILITY AND SO MAY BE COLLECTED BY THE BANK AT ANY TIME. A NEW FACILITY MUTUALLY AGREED UPON AND SUBSEQUENTLY ISSUED MAY CARRY A HIGHER OR LOWER RATE OF INTEREST.**

G.   For residents of California:

Each Borrower is hereby notified that a negative credit report reflecting on such Borrower's credit record may be submitted to a credit reporting agency if any Borrower fails to fulfill his or her obligations under the LAL Agreement.

H.   For residents of Connecticut:

BORROWER ACKNOWLEDGES THAT THE TRANSACTIONS REPRESENTED BY THIS AGREEMENT ARE COMMERCIAL TRANSACTIONS AND HEREBY VOLUNTARILY AND KNOWINGLY WAIVES ANY RIGHTS TO NOTICE OF AND HEARING ON PREJUDGMENT REMEDIES UNDER CHAPTER 903A OF THE CONNECTICUT GENERAL STATUTES OR OTHER STATUTES AFFECTING PREJUDGMENT REMEDIES, AND AUTHORIZE THE BANK'S ATTORNEY TO ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER.

---

For Morgan Stanley Private Bank, National Association Use Only

MAXMILIANO FRANCO PILIPIS

BORROWER NAME

Morgan Stanley

LENLALTC

5764-245

LAL NUMBER
LIQUIDITY ACCESS LINE TERMS AND CONDITIONS
(09/2018) LENLALTC
Page 21 of 21
NY CS 9346538 09/18

**Keep This For Your Records**